# 16-2321-CV

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

CAPITOL RECORDS, LLC, CAPITOL CHRISTIAN MUSIC GROUP, INC.,
VIRGIN RECORDS IR HOLDINGS, INC.,

*Plaintiffs-Appellees,*

—against—

REDIGI INC., JOHN OSSENMACHER, LARRY RUDOLPH,
AKA LAWRENCE S. ROGEL,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANTS-APPELLANTS
## [REDACTED]

ROBERT C. WELSH
C. DENNIS LOOMIS
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard,
Suite 1400
Los Angeles, California 90025-0509
(310) 820-8800

*Attorneys for Defendants-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendant-

Appellant ReDigi Inc. states, by and through its undersigned counsel, that it has no

parent corporation and that there is no publicly held corporation that owns 10% or

more of its stock.

Dated:  Los Angeles, California
          February _7_ , 2017

Respectfully submitted,

 /s/ Robert C. Welsh
Robert C. Welsh
C. Dennis Loomis
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA  90025
Tel. (310) 820-8800
Fax (310) 820-8859

*Attorneys for Defendants ReDigi Inc.,
John Ossenmacher and Larry Rudolph
aka Lawrence S. Rogel*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

JURISDICTIONAL STATEMENT .........................................................................2

ISSUES PRESENTED FOR REVIEW ....................................................................2

STATEMENT OF THE CASE.................................................................................4

SUMMARY OF ARGUMENT ...............................................................................9

ARGUMENT ........................................................................................................12

    I.    ITUNES MUSIC FILES ARE "PHONORECORDS" UNDER THE COPYRIGHT ACT. ...................................................................12

        A.    Electronic Music Files Are "Material Objects" Under the Copyright Act....................................................................13

            1.    The Audio Home Recording Act....................................14

            2.    The Digital Performance Right in Sound Recording Act......................................................................15

        B.    Governing Federal Authorities Confirm That Electronic Files Are Material Objects Under the Copyright Act. ..............16

        C.    Capitol Treats iTunes Music Downloads as "Phonorecords" In Paying Royalties To Recording Artists. ...............................18

        D.    Capitol's Digital Music Download Agreement with Apple Shows That the iTunes Music File, Not A Computer Hard Disk, is the Phonorecord. .........................................................19

        E.    If The Hard Disk, Not The Electronic File, Were The Phonorecord, It Would Call Into Question Whether the Transmission of the iTunes Music File From Apple To The Consumer Qualifies As A "Distribution" Within the Meaning Of Section 106(3). .....................................................20

**TABLE OF CONTENTS**
**(continued)**

**Page**

II. REDIGI'S TECHNOLOGY TRANSFERS DIGITAL MUSIC FILES FROM A CONSUMER'S COMPUTER TO REDIGI'S SERVER WITHOUT MAKING ANY REPRODUCTIONS OF CAPITOL'S SOUND RECORDINGS. ..............................22

    A. How ReDigi's Technology Transfers iTunes Music Files to ReDigi's Server. ..............................23

    B. ReDigi's Transfer Method Does Not Result in the Creation of a New Phonorecord. ..............................27

III. REDIGI'S TECHNOLOGY PERMITS THE TRANSFER OF OWNERSHIP OF PARTICULAR ITUNES MUSIC FILES IN A MANNER THAT CONFORMS WITH THE FIRST SALE DOCTRINE. ..............................28

    A. Consumers Who Lawfully Purchase iTunes Music Files Are "Owners" Of Those Files And Thus Entitled To First Sale Protection. ..............................30

    B. The District Court's Ruling Exceeds The Restraints Permitted By the First Sale Doctrine. ..............................31

    C. The District Court's Ruling Imposes Anti-Competitive Restraints That Are Prohibited By The First Sale Doctrine. ....34

    D. The District Court's Imposition of Additional Burdensome Restraints on the Resale of Lawfully Purchased iTunes Music Files Violates the First Sale Doctrine's Equal Treatment Principle. ..............................36

    E. None of the Policy Reasons Identified by the District Court Warrant the Unequal Treatment of iTunes Music Files Under the First Sale Doctrine. ..............................39

IV. REDIGI'S TECHNOLOGY IS PROTECTED BY THE FAIR USE DOCTRINE ..............................42

CONCLUSION ..............................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Stellar Records, Inc.*,
96 F.3d 60 (2d Cir. 1996) ................................................................13

*Agee v. Paramount Communications, Inc.*,
59 F.3d 317 (2d Cir. 1995) ........................................................*passim*

*American Int'l Pictures, Inc. v. Foreman*,
5786 F.2d 661 (5th Cir. 1978) .........................................................33

*Authors Guild v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) .........................................................43, 44

*Bobbs-Merrill Co. v. Straus*,
210 U.S. 339, 28 S.Ct. 722 (1908).........................................31, 32, 33, 34

*Capitol Records, LLC v. ReDigi*,
934 F.Supp.2d 640 (S.D.N.Y. 2013) ...........................................*passim*

*The Cartoon Network LP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) ...................................................17, 27, 28

*Davis v. Capitol Records*,
LLC, 2013 WL 1701746 (N.D. Cal. Apr. 18, 2013) ....................18, 19

*Kirstaeng v. John Wiley & Sons, Inc.*,
___ U.S. ___, 131 S. Ct. 1351 (2013).........................................*passim*

*Kirstaeng v. John Wiley & Sons, Inc.*,
133 S.Ct. 1351 (2013)..............................................................*passim*

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
551 U.S. 877, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) ...................35

*London-Sire Records, Inc. v. John Doe 1*,
542 F.Supp.2d 153 (D. Mass. 2008).................................................21

*Matthew Bender & Company, Inc. v. West Publishing Co.*,
158 F.3d 693 (2d Cir. 1998) ...............................................2, 10, 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*New York Times Co. v. Tasini,*
   533 U.S. 483 (2001)................................................................16

*Playboy Enterprises, Inc. v. Frena,*
   839 F.Supp.1552 (M.D. Fla. 1993).....................................22

*Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.,*
   523 U.S. 135 (1998)........................................................*passim*

*Recording Industry Association of America v. Diamond Multimedia*
   *Systems, Inc.,*
   180 F.3d 1072 (9th Cir. 1999) ...............................................13

*Stewart v. Abend,*
   495 U.S. 207 (1990)................................................................29

**Statutes**

17 U.S.C. § 101 .................................................................9, 10, 13

17 U.S.C. §§ 106(2) and 106(3).....................................................4

17 U.S.C. § 107 ............................................................................4, 44

17 U.S.C. § 109(a) ................................................................*passim*

17 U.S.C. § 115(c)(2)....................................................................16

17 U.S.C. §§ 115(c)(3)(C) – (G)....................................................15

17 U.S.C. § 1001(5)(A)..................................................................14

17 U.S.C. § 1001(5)(B)..................................................................14

28 U.S.C. § 1291 .............................................................................2

1909 Copyright Act section 27 .................................................33, 34

1909 Copyright Act section 41 .......................................................30

Areeda & H. Hovenkamp, Antitrust Law ¶ 100, p. 4 (3d ed. 2006).......................35

Audio Home Recording Act, 17 U.S.C. § 1001 et seq. ...................13, 14

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Digital Performance Right Sound Recording Act of 1995, 17 U.S.C. § 115...................................................................................................15, 16

**Other Authorities**

1976 Copyright Act, H.R. Rep. No. 487, 92nd Cong., 1st Sess........................11, 12

Aaron Perzanowski and Jason Schultz, *Digital Exhaustion*, 58 UCLA L. Rev. 889, 895 (2011).................................................................................40

Anindya Ghose, et. al, *Internet Exchanges for Used Books: An Empirical Analysis of Product Cannibalization and Welfare Impact* ......................................................................................................40

E. Coke, Institutes of the Laws of England § 360, p. 223 (1628) ..........................35

Niels Schaumann, *Copyright Infringement and Peer-to-Peer Technology*, 28 Wm. Mitchell L. Rev. 1001, 1036-37 (2002) ..........................16

U.S. Copyright Office, *DMCA Section 104 Report* 79 (2001) ..............................42

U.S. Copyright Office, *The Making Available Right in the United States* 4 (2016) ...................................................................................18, 42

9 William F. Patry, PATRY ON COPYRIGHT § 13:23 (West 2013) ...........................16

## **PRELIMINARY STATEMENT**

In an age of diminished resources and ever-growing dockets, it is understandable that district courts want to resolve cases at the earliest opportunity. But some cases cannot be decided on summary judgment without distorting applicable standards.

The district court mistakenly concluded that it could decide what it acknowledged was a "novel question" of copyright law regarding the transfer of iTunes music files or downloads over the Internet based on an incorrect analysis of the term "phonorecord" under the Copyright Act, and without regard to how appellant ReDigi's technology actually operated.

The district court's conclusion that federal copyright law considers a consumer's computer hard disk to be the "phonorecord" in the context of transferring iTunes music files over the Internet is both inconsistent with various provisions of the Copyright Act and contrary to governing law in this Circuit. Had the district court properly recognized that iTunes music files or downloads are themselves the phonorecords, it would have realized that it could not resolve Capitol's infringement claims without first determining how ReDigi's technology actually operated. And as the district court itself acknowledged, the manner by which ReDigi's technology transferred ownership of iTunes music files was "a source of contention between the parties." Therefore, the district court erred in

1

resolving Capitol's infringement claims on summary judgment and should have allowed the matter to proceed to trial.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291. The United States District Court for the Southern District of New York entered an order granting partial summary judgment on March 30, 2013. (A-1058 - 1074).[1] On June 3, 2016, the district court entered a Stipulated Final Judgment Subject to Reservation of Right of Appeal. (A-1262). Appellants filed a timely notice of appeal on June 30, 2016. (A-1278).

## ISSUES PRESENTED FOR REVIEW

1.      Did the district court err in interpreting the Copyright Act's definition of "phonorecords" as "material objects" to mean that in the context of distributing iTunes music files or downloads over the Internet, the "phonorecord" was a consumer's computer hard disk?

2.      This Court has held that any material object "in which copyrightable objects are capable of being 'fixed' . . . and 'from which [the work] can be perceived or communicated directly or with the aid of a machine" can be a "phonorecord" under the Copyright Act. *Matthew Bender & Company, Inc. v. West Publishing Co.*, 158 F.3d 693, 702 (2d Cir. 1998). Did the district court err in

---

[1] References to "A-__" are to the applicable pages of the Joint Appendix filed herewith.

2

failing to recognize that iTunes music files or downloads are themselves "phonorecords" under the Act?

3. The Supreme Court stated in *Kirstaeng v. John Wiley & Sons, Inc.,* ___ U.S. ___, 131 S. Ct. 1351, 1361 (2013), that 17 U.S.C. § 109(a) "now makes clear that . . . one who *owns* a copy [of a copyrighted good] *will* receive 'first sale' protection, *provided*, of course, that the copy was '*lawfully* made' and not pirated." *Id*. at 1361 (emphasis in original). Are the restraints the district court imposed on a consumer's ability to convey her ownership interest in lawfully purchased iTunes music files consistent with the limitations section 109(a) imposes on the ability of copyright owners to control downstream sales?

4. The district court ruled that the only way a lawful purchaser of an iTunes music file could transfer that file without infringing Capitol's exclusive rights was by "the lawful owner's sale of her . . . computer hard disk or other memory device onto which the file was originally loaded." Does requiring a lawful purchaser of an iTunes music file to part with additional valuable personal property in order to transfer or sell the purchaser's ownership of the iTunes music file violate the prohibition against restraints on the alienation of chattels embodied in the first sale doctrine?

5. This Court has held that the copyright holder's right to distribute "copies" of "phonorecords" containing the copyrighted work is predicated on an

3

exchange of the "material embodiment of [the] copyrighted work." *Agee v. Paramount Communications, Inc.*, 59 F.3d 317, 325 (2d Cir. 1995). By holding that the "phonorecord" is the consumer's computer hard disk or memory device, does the district court's ruling call into question whether the original transfer from Apple to the consumer was a "distribution"?

6. ReDigi presented substantial evidence that its technology permits consumers to transfer lawfully purchased iTunes music files without making any "reproductions" of the iTunes music file. Did the district court err in granting summary judgment to Capitol on its claims for violation of its reproduction and distribution rights under 17 U.S.C. §§ 106(2) and 106(3)?

7. ReDigi presented substantial evidence that its now-patented technology furthers the goals of the Copyright Act by extending first sale protection to lawful owners of iTunes music files while also providing substantial safeguards against the misuse of its technology. Is ReDigi's technology protected by the fair use doctrine, 17 U.S.C. § 107?

## STATEMENT OF THE CASE

Plaintiffs Capitol Records, LLC, Capitol Christian Music Group and Virgin Records IR Holdings, Inc. (collectively "Capitol") allege that Defendants ReDigi Inc., John Ossenmacher and Larry Rudolph aka Lawrence S. Rogel (collectively "ReDigi") infringed Capitol's exclusive rights under copyright by creating a virtual

4

marketplace in which lawful purchasers of iTunes music files may sell or otherwise transfer ownership of those music files. After taking discovery, Capitol sought summary judgment of its infringement claims.

Capitol made two basic arguments to the district court. First, it wrongly contended that in connection with Capitol's unsuccessful attempt to obtain a preliminary injunction, ReDigi's witnesses admitted that ReDigi's technology causes copies of Capitol's sound recordings to be made as part of the transfer process to ReDigi's "cloud" server. (A-238 - 241) In fact, as explained below and in detailed evidence on summary judgment, ReDigi's technology is able to transfer an iTunes music file without copying. At no time during discovery did Capitol actually examine of ReDigi's system code to determine whether ReDigi could transfer iTunes music files without causing any reproductions to be made. (A-840)

Second, Capitol argued that examination of ReDigi's technology was unnecessary because any transfer of an iTunes music file over the Internet necessarily resulted in the creation of a new "phonorecord" as defined under the Copyright Act. Relying on the Act's definition of "phonorecords" as "material objects," Capitol argued that the only "material objects" involved in the transfer of iTunes music files were a consumer's computer hard disk or other Apple-compatible device capable of storing electronic music files. (A-236 - 238) As a result, the transfer of an iTunes music file from the consumer's hard disk to

5

ReDigi's server necessarily resulted in the creation of a new "phonorecord" because it was impossible to transfer a "material object" over the Internet.  (A-238) Based on the same reasoning, Capitol asserted that ReDigi's technology was not protected under the first sale doctrine and therefore infringed Capitol's distribution right because it was not physically possible to transfer over the Internet the particular phonorecord that the consumer had lawfully purchased from Apple to ReDigi's server.  (A-252)  Capitol also argued that ReDigi's technology was not protected under section 109(a) because it did not satisfy any of the fair use "factors" identified in the statute.  (A-248 - 249)  Capitol argued that ReDigi was liable for direct, contributory and vicarious infringement as well as inducing infringing conduct.  (A-242 - 247)

The district court partially granted Capitol's motion for summary judgment, finding that ReDigi's now-patented technology infringed Capitol's reproduction and distribution rights under sections 106(1) and 106(3) of the U.S. Copyright Act. 17 U.S.C. §§ 106(1) and 106(3).  The district court also found that material disputed facts prevented the court from ruling on Capitol's claims for infringement of its public performance and display rights under sections 106(4) and 106(5). *Capitol Records, LLC v. ReDigi*, 934 F.Supp.2d 640, 652 (S.D.N.Y. 2013).  The district court also denied ReDigi's separate motion for summary judgment.  (A-1074)

The district court did not dispute that ReDigi had presented evidence that its technology did not involve the making of any reproductions of Capitol's sound recordings. *Id.* at 650 n. 5. Nevertheless, the district court agreed with Capitol that it was unnecessary to resolve factual disputes about the capabilities of ReDigi's technology to grant summary judgment in Capitol's favor. The district court adopted Capitol's argument that the "phonorecord" embodying Capitol's sound recordings was "'the appropriate segment of the [consumer's] hard disk' that the file would be embedded in following its transfer [to the consumer]." *Id.* at 649. The district court concluded that any transfer of an iTunes music file to ReDigi's server necessarily infringed Capitol's rights because "by the laws of physics . . . [i]t is simply impossible that the same 'material object' [i.e., the phonorecord] can be transferred over the Internet." *Id.*

The district court relied on the same reasoning to conclude that ReDigi's technology was not protected under the first sale doctrine set forth in section 109(a) of the Copyright Act. 17 U.S.C. § 109(a); *see* 934 F.Supp.2d at 655. Noting that the first sale doctrine only permits the consumer to transfer the "particular phonorecord" the consumer had lawfully purchased from iTunes, the district court concluded that ReDigi's technology could only allow the transfer of "*reproductions* of copyrighted code" (*id.* (emphasis in original)), which are not protected under the first sale doctrine. As a result, the district court concluded that

7

the only way a consumer could legitimately transfer a lawfully purchased iTunes music file is by "the lawful owner's sale of her . . . computer hard disk . . . or other memory device onto which the file was originally downloaded." *Id*. at 656.

The district court, however, failed to consider that the iTunes music file or download *itself* is a "phonorecord" under the Copyright Act. Unlike a hard disk, nothing in the "laws of physics" prevents an iTunes music file from being transferred over the Internet. ReDigi provided credible, specific evidence that its technology could transfer such files without creating a reproduction of the source iTunes music file. By disregarding this evidence, the district court erred in granting summary judgment to Capitol on its infringement claim.[2] (A-650 – 678; A-686 – 707; A-864 – 914; A-987 – 993; A-1484 – 1496)

For this same reason, as ReDigi's technology transfers exclusive ownership of source iTunes music files purchased from Apple from the initial purchaser to another without making reproductions of the transferred files, the initial purchaser lawfully may sell the source files under the first sale doctrine. ReDigi submitted credible evidence that its technology accomplishes just what section 109(a) requires for the first sale doctrine to apply. (A-690 – 695; A-698 – 701; A-704 -

---

[2] The only rebuttal submitted by Capitol was a declaration by its expert, Doug Jacobson, who never actually examined the software code comprising ReDigi's technology. Prof. Jacobson's contradictory conclusions, without any supporting factual basis, are arguably insufficient to even create a triable issue of fact. (A-766 – 770)

8

707) ReDigi's technology is also permitted by the fair use doctrine, because it furthers the public interest by extending reasonable first sale protections to lawful owners of iTunes music files.

The district court erred in deciding Capitol's copyright infringement claims given the highly disputed issues regarding the actual capabilities of ReDigi's technology. This Court should reverse.

## SUMMARY OF ARGUMENT

The fundamental copyright issue presented by ReDigi's appeal is what constitutes the "phonorecord" embodying Capitol's copyrighted sound recording in the context of Apple's distribution of iTunes music files or downloads over the Internet. The district court concluded that in order to satisfy the Copyright Act's definition of "phonorecords" as "material objects in which sounds . . . are fixed . . . and from which the sounds can be perceived, reproduced, or otherwise communicated" (17 U.S.C. § 101), the phonorecord had to be the physical space on the consumer's computer hard disk where the particular music file is stored. The district court assumed this without inquiring into the "material object" requirement, including whether the iTunes music files or downloads could themselves satisfy that requirement. The district court was mistaken.

First, the district court's interpretation of the "material object" requirement conflicts with governing law. The Copyright Act defines "phonorecords" as

9

"material objects in which sounds, other than those accompanying a motion picture or other audiovisual work, are fixed by any method now know or later developed." 17 U.S.C. § 101. The Act's materiality requirement does not impose "physical limitations," as the lower court held, *see* 934 F.Supp.2d at 656, on the meaning of "phonorecords" that would restrict them to tangible objects like compact discs or books.

Rather, as this Court has made clear, materiality refers to the medium in which the copyrighted work or sound recording is "fixed." "The sole purpose of § 101's definition of the words 'copies' and 'fixed' is to . . . define the material objects in which copyrightable and infringing works may be embedded and do not describe the requisite fixed nature of that work within the material object." *Matthew Bender*, 158 F.3d at 702. This means that any medium in which a copyrighted work is "fixed" and from which the copyrighted work can be perceived directly or with aid of a machine or device can satisfy the Copyright Act's materiality requirement. This includes the iTunes music files or downloads embodying Capitol's sound recordings. As such, the Supreme Court, this Court, and the Copyright Office have all concluded that an electronic music file can constitute a "material object" under the Copyright Act.

Further, by insisting that the "phonorecord" is the computer hard disk, the district court was forced to conclude that the only way a consumer could transfer a

10

lawfully purchased iTunes music file was by physically transferring the consumer's hard disk as part of the sale. The obvious shortcoming with this analysis is that it requires lawful purchasers of iTunes music files *to convey more than they purchased from the copyright holder* in order to legitimately transfer ownership of their iTunes music files. The imposition of such costly and burdensome requirements is inconsistent with the consumer's acknowledged ownership of the lawfully purchased iTunes music file and amounts to an impermissible restraint on the alienation of personal property—the very thing the first sale doctrine was designed to prevent. *See Kirstaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351, 1363 (2013) (first sale doctrine "is a common-law doctrine with an impeccable historic pedigree" that derives from "the common law's refusal to permit restraints on the alienation of chattels.").

Even more fundamentally, the district court's analysis calls into question whether the original transfer of the iTunes music file to the consumer satisfies the requirements of section 106(3). This Court has long recognized that exercise of a copyright holder's right to distribute copies or phonorecords containing the copyrighted work "is generally thought to require transmission of a 'material object' in which the sound recording is fixed." *Agee v. Paramount Communications, Inc.*, 59 F.3d 317, 325 (2d Cir. 1995). Indeed, the *Agee* Court, quoting the House Report accompanying the 1976 Copyright Act, H.R. Rep. No.

11

487, 92nd Cong., 1st Sess. at 138 ("House Report"), reiterated that "any form or dissemination in which a material object does not change hands—performances or displays on television, for example—is not a publication no matter how many people are exposed." *Id.* So, the music file itself, which is all that the purchaser receives from Apple, must be the "material object" that is being distributed.

In short, the district court's analysis cannot be squared with either the express terms of the Copyright Act or governing federal law. ReDigi respectfully submits that the district court came to these problematic conclusions because it failed to recognize that the iTunes music files or downloads themselves are material objects that satisfy the Copyright Act's definition of "phonorecords."

## ARGUMENT

### I. ITUNES MUSIC FILES ARE "PHONORECORDS" UNDER THE COPYRIGHT ACT.

Though acknowledging the novelty of the copyright issues presented by Capitol's lawsuit (934 F.Supp.2d at 648), the district court did not squarely address the decisive issue in this case, namely, what constitutes the phonorecord embodying Capitol's copyrighted sound recordings in the context of distributing iTunes music files over the Internet? The district court focused solely on the "material objects" portion of the Copyright Act's definition of phonorecords, concluding that the consumer's hard disk or other Apple-compatible device capable of storing electronic music files were the only objects having the requisite

12

"physical" existence to satisfy this requirement.[3]  The district court erred in so holding.

### A. Electronic Music Files Are "Material Objects" Under the Copyright Act.

Beginning with adoption of the 1976 Copyright Act and continuing through enactment of the Audio Home Recording Act and Digital Millennium Copyright Act, Congress has expanded the types of "material objects" that can embody copyrighted works to include electronic music files.

Congress made clear when it enacted the 1976 Copyright Act that it had revised the definition of "phonorecord" specifically for the purpose of "avoid[ing]

---

[3] The district court also failed to consider that a computer hard disk cannot constitute a "phonorecord" because it contains more than sound recordings.  By its terms, the Copyright Act protects copyrightable "works" that are embodied in two types of "material objects," which are referred to as "copies" and "phonorecords." The Copyright Act defines "phonorecords" as material objects in which "sounds other than those accompanying a motion picture or other audio visual work are fixed."  17 U.S.C. § 101.  By contrast, "copies" are defined as "material objects, other than phonorecords in which a work is fixed."  *Id.*  As these definitions make clear, "phonorecords" are limited to "material objects" that only embody sound recordings.  A consumer's computer hard disk contains computer programs as well as some combination of photographs, written documents, motion pictures, computer games, video games, and other types of works.  As this Court has recognized, Congress' careful distinction between "phonorecords" and "copies" must be respected.  *See ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 66 (2d Cir. 1996) (karaoke-style compact discs containing sounds and visual displays of lyrics were "copies" not "phonorecords"); *accord Recording Industry Association of America v. Diamond Multimedia Systems, Inc.*, 180 F.3d 1072, 1076 (9th Cir. 1999) (under the Audio Home Recording Act, 17 U.S.C. § 1001 et seq., a computer hard disk cannot be a "digital musical recording" because "a hard drive is a material object in which one or more programs are fixed.").

13

the artificial and largely unjustifiable distinctions derived from cases . . . under which copyrightability in certain cases has been made to depend upon the form or medium in which the work is fixed." House Report at 5665 (emphasis added). Congress stated that "it makes no difference what the form, manner, or medium of fixation may be," nor "whether it is capable of perception directly or by means of any machine or device now known or later developed." *Id.*

### 1.    *The Audio Home Recording Act.*

In 1992, Congress enacted the Audio Home Recording Act, 17 U.S.C. § 1001 *et seq.*, which extended copyright protection and control to digital audio musical recordings. Section 1001(5)(A) defines a "digital musical recording" as "a *material object* (1) in which are fixed in a digital recording format, only sounds, and material, statements, or instructions incidental to those fixed sounds, if any, and (2) from which the sounds and material can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 1001(5)(A) (emphasis added). It further provides that a digital musical recording "may contain statements or instructions constituting the fixed sounds and incidental material and statements or instructions to be used directly or indirectly in order to bring about the perception, reproduction, or communication of the fixed sounds and incidental material." 17 U.S.C. § 1001(5)(B).

14

In short, Congress made clear that a digital music recording containing instructions on how to perceive its sounds is a "material object" under the Copyright Act.

### 2. *The Digital Performance Right in Sound Recording Act.*

Congress again recognized that electronic files could satisfy the Copyright Act's "material object" requirement in the Digital Performance Right Sound Recording Act of 1995, 17 U.S.C. § 115. Specifically, section 115 considers electronic music files to be "material objects" and imposes various requirements on the distribution of electronic music files, including obtaining permission from the sound recording copyright owner to make electronic distributions, obtaining a compulsory license, and requiring that music files contain certain identifying information. *See, e.g.*, 17 U.S.C. §§ 115(c)(3)(C) – (G).

In addition, section 115(d) defines "digital phonorecord delivery" to include "each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord of that sound recording."

Nothing in Congress' definition indicates that saving the digital transmission to a computer hard disk was required in order to be considered a "digital phonorecord delivery." Rather, a distribution occurs when as part of the copyright holder's first sale, the copyright owner relinquishes ownership of the particular

15

copy of the electronic music file sent to the consumer. *See* 17 U.S.C. § 115(c)(2) ("a phonorecord is considered 'distributed' if the person exercising the compulsory license has voluntarily and permanently parted with its possession."). As one noted copyright commentator has observed, "section 115 was substantially rewritten in 1995 specifically to include digital distributions of nondramatic musical compositions, under the theory that such distributions were the equivalent, in every respect, of a hard copy distribution." 9 William F. Patry, PATRY ON COPYRIGHT § 13:23 (West 2013); *see also* Niels Schaumann, *Copyright Infringement and Peer-to-Peer Technology*, 28 Wm. Mitchell L. Rev. 1001, 1036-37 (2002) ("Digital phonorecord delivery is legally and, in most respects functionally, the same as distributing tangible copies of a phonorecord to the public").

**B.    Governing Federal Authorities Confirm That Electronic Files Are Material Objects Under the Copyright Act.**

The proposition that an electronic music file is a material object under the Copyright Act is also supported by governing case law. In *New York Times Co. v. Tasini*, 533 U.S. 483 (2001), the Supreme Court affirmed this Court's determination that certain print and electronic publishers' licensing of electronic-only copies of the plaintiff's articles to certain electronic databases "effectively overrides the Authors' exclusive right to control the individual reproduction and distribution of each Article." *Id*. at 503-04. Implicit in the Court's determination

16

that the publishers infringed the authors' distribution rights was the recognition that electronic distributions constitute material objects.

Additionally, this Court has held that "'all the material objects in which copyrightable objects are capable of being 'fixed' . . . and 'from which [the work] can be perceived or communicated directly or with the aid of a machine'" can constitute a phonorecord or copy within the meaning of the Copyright Act. *Matthew Bender*, 158 F.3d at 702, *quoting* 1 William F. Patry, *Copyright Law and Practice* 168 (1994).

In *The Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), this Court confirmed that electronic files can satisfy the Copyright Act's materiality requirement for copies or phonorecords so long as they comply with the Act's embodiment and duration requirements. *Id.* at 127. As this Court explained, in order to satisfy the embodiment requirement, "the work must be embodied in a medium, i.e., placed in a medium such that it can be perceived, reproduced, etc." *Id.* Next, the copyrighted work must satisfy the "duration requirement," which means that the work "must remain thus embodied 'for a period of more than transitory duration.'" *Id.* It is undisputed that iTunes music files or downloads satisfy both requirements. They both embody the data comprising Capitol's sound recording and provide the medium through which those sounds can be perceived by a consumer's computer. (A-1501 (definition of "Download"); A-1502

17

(definitions of "Purchaser" and "Recipient Device"); A-701; A-706-707; A-988)

Also, iTunes music files exist for a sufficient time to satisfy the duration

requirement.

The Copyright Office concurs. In a 2016 Report to Congress, the Copyright

Office concluded that section 106(3), which governs copyright protections on

distribution, "extends to the digital transfer of copies or phonorecords in electronic

formats and is not limited to the conveyance of tangible objects." *See* U.S.

Copyright Office, *The Making Available Right in the United States* 4 (2016) (

"2016 Report").

### C. Capitol Treats iTunes Music Downloads as "Phonorecords" In Paying Royalties To Recording Artists.

That iTunes music files are phonorecords under the Copyright Act is further

demonstrated by Capitol's position in another lawsuit that was pending when this

case was in the district court. In this case, Capitol argued below that the only

"material objects" involved in the transfer of iTunes music files were a consumer's

computer hard disk or other Apple-compatible device capable of storing electronic

music files. (*See* A 236 - 238) But in *Davis v. Capitol Records*, LLC, 2013 WL

1701746 at *1 (N.D. Cal. Apr. 18, 2013), Capitol argued that downloads of iTunes

music files were phonorecords for the purpose of calculating royalty payments. In

*Davis,* the plaintiff (a member of the music group *The Motels*) brought suit against

Capitol for treating the sale of the group's recordings through digital content

18

providers such as Apple as the sale of a "phonorecord." As the court in *Davis* remarked, "[i]n *ReDigi*, Capitol alleges that digital downloads received by consumers are not phonorecords for purposes of reselling them consistent with the first sale doctrine of the U.S. Copyright Act. 17 U.S.C. § 109. Yet, with respect to Davis and others, Capitol treats digital downloads as sales of phonorecords for royalty purposes." 2013 WL 1701746 at *7.

As the term "phonorecord" has the same definition under the Copyright Act for royalty purposes as with respect to the first sale doctrine, Capitol's position here is inconsistent with Congress' recognition that digital downloads of music files satisfy the Copyright Act's definition of "phonorecords."

**D.     Capitol's Digital Music Download Agreement with Apple Shows That the iTunes Music File, Not A Computer Hard Disk, is the Phonorecord.**

Capitol's understanding that the iTunes music file or download is the phonorecord is further demonstrated by the definitions set forth in operative agreements governing Apple's distribution of ITunes music files containing Capitol's sound recordings (collectively the "Agreement"). (A-1498 - 1512) █

█████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

19



The Agreement's definitions clarify that the iTunes music file or download was considered the phonorecord and the consumers' Apple computer or tablet was merely the "Device"—analogous to a juke box—on which the phonorecords were stored for future play.

**E.    If The Hard Disk, Not The Electronic File, Were The Phonorecord, It Would Call Into Question Whether the Transmission of the iTunes Music File From Apple To The Consumer Qualifies As A "Distribution" Within the Meaning Of Section 106(3).**

The district court's analysis is also problematic because it suggests that the initial transfer of the iTunes music file from Apple to the consumer's computer does not qualify as a "distribution" under section 106(3). By insisting that only

20

"physical" objects can qualify as "phonorecords," the district court's ruling would seem to support the conclusion that Apple does not actually "distribute" any phonorecords to consumers over the Internet. Rather, under the district court's analysis, Apple merely transmits a digital stream containing the iTunes music file and the actual phonorecord is not created until the digital stream is later saved to the consumer's computer hard disk.

The district court was not troubled by this proposition. Relying on an incomplete reading of a Massachusetts federal court decision, *London-Sire Records, Inc. v. John Doe 1*, 542 F.Supp.2d 153, 173 (D. Mass. 2008), the district court concluded that a valid distribution may occur even if the transfer only results in a "material object being created elsewhere at its finish." 934 F.Supp.2d at 649.[4]

But Congress has expressly required that an actual exchange of the phonorecord or copy take place in order for a distribution to occur. In the House Report accompanying passage of the 1976 Copyright Act, Congress stated unequivocally that "any form or dissemination in which a material object does not change hands—performances or displays on television for example—is not a publication no matter how many people are exposed to the work." House Report at 138. Additionally, as noted above, this Court expressly cited to this portion of the

---

[4] The district court in the *London-Sire Records* case explicitly recognized that "Electronic Files Are Material Objects." 542 F.Supp.2d at 170.

House Report in *Agee*, 59 F.3d 317, for its conclusion that distributions under section 106(3) are based on an exchange of the material object embodying the copyrighted work.

As this Court explained in *Agee,* allowing record companies to claim infringement of their distribution right in the absence of the exchange of a phonorecord containing the copyrighted sound recording would be tantamount to giving sound recording copyright owners a public performance right that Congress had elected not to grant. *Id.* at 325.[5] Equally important, the Court expressly refused to interpret the Copyright Act to foreclose all forms of "non-physical" distributions. "We are unwilling to say that disseminations must always be in physical form to constitute 'distributions,'" *Id.* at 325-26 (citing *Playboy Enterprises, Inc. v. Frena*, 839 F.Supp.1552 (M.D. Fla. 1993)).

## II. REDIGI'S TECHNOLOGY TRANSFERS DIGITAL MUSIC FILES FROM A CONSUMER'S COMPUTER TO REDIGI'S SERVER WITHOUT MAKING ANY REPRODUCTIONS OF CAPITOL'S SOUND RECORDINGS.

Because iTunes music files or downloads satisfy the Copyright Act's definition of "phonorecords," disputed issues of fact regarding ReDigi's technology should have precluded the district court from granting Capitol's summary judgment motion. ReDigi submitted declarations and excerpts from the

---

[5] Congress amended § 106 in 1995 to recognize an exclusive right "to perform [sound recordings] by means of a digital audio transmission."

depositions of its witnesses describing how ReDigi's technology transfers iTunes music files without making any reproductions of Capitol's sound recordings. (A-650 – 678; A-686 – 707; A-864 – 914; A-987 – 993; A-1484 - 1496)

As an initial matter, the declarations and deposition testimony make clear that while the initial version of ReDigi's technology ("ReDigi 1.0") required consumers to transfer their iTunes music files from a consumer's computer to ReDigi's server in order to be able to sell or transfer that file to another person, the current version of ReDigi's technology ("ReDigi 2.0") allows consumers to skip the transfer process entirely. (A-698 – 699; A-704 - 705) Under ReDigi 2.0, consumers can lawfully purchase their iTunes music files from Apple and have those digital downloads delivered directly to ReDigi's server. (*Id.*) As discussed more fully below, once the iTunes music file resides on ReDigi's server, ReDigi is able to transfer exclusive ownership and access to that file by simply adjusting the user identifier information and without making any reproductions of Capitol's sound recording. (A-694; A-701; A-707) Hence, under ReDigi 2.0, the original source iTunes music exists initially on ReDigi's server and is never copied during the course of transferring ownership. (*Id.*)

### A. How ReDigi's Technology Transfers iTunes Music Files to ReDigi's Server.

For iTunes music files that are not stored initially on ReDigi's server, ReDigi allows consumers to transfer their files using a method that is different

23

from conventional "copy and delete" or "forward and delete" transfer methods. Whereas these conventional methods involve the creation of a reproduction of the copyrighted work which is deleted following a successful transfer, ReDigi's technology is able to transfer an iTunes music file without making any copies.

At the outset, a consumer is required to download ReDigi's proprietary "Media Manager" software ("Media Manager"). (A-687 – 688; A-697 – 698; A-703 - 704) Once installed, the Media Manager scans the user's computer and all connected devices for music files and identifies all original source iTunes music files that the consumer purchased from Apple. (*Id.*) The Media Manager will only permit these original lawfully purchased source iTunes music files to be transferred to ReDigi's "cloud" server. (*Id.*)

ReDigi's transfer process begins by breaking the compressed MP3 music file into small "blocks" of roughly four thousand bytes in length. (A-690 – 693; A-699 – 701; A-705 – 707; A-987 - 990) The transfer process commences with the last "block" of data in the particular music file. This block is read into the computer's buffer, which causes a transitory copy of the block to be made. However, at the instant the block is read into the buffer, an instruction causes that block to be removed from the iTunes music file remaining in the consumer's computer as the block is transferred from the buffer to ReDigi's server. (A-690 – 693; A699 – 701; A-705 - 707) Through the exercise of these commands, each

24

block of data is sequentially removed from the iTunes music file in the consumer's computer and transferred to ReDigi's server. (*Id.*) This process repeats itself block-by-block of data until all the blocks have been transferred to ReDigi's server and none of the blocks remain in the consumer's computer. (*Id.*) Significantly, during the transfer process, the sum of the size of the data transferred to ReDigi's server, when added to the size of the data remaining in the consumer's computer or in transit, equals the size of the original file. (*Id.*) This further confirms that no reproductions are made during the transfer process.

Additionally, the transfer method used by ReDigi is unlike conventional technologies because it involves the normal risks any owner of a copy of a copyrighted work faces in disposing of a lawfully purchased copy of the work. Just as a consumer's sale of a lawfully purchased CD may fail because the delivery service lost the package, the transfer process used by ReDigi carries a similar risk of loss. If the transfer process from a consumer's computer to ReDigi's server is interrupted for any reason, the iTunes music file will be permanently lost—to both the consumer and ReDigi. (A-1489) As a result, ReDigi assures subscribers that should such a loss occur, ReDigi will purchase a new music file from iTunes at its expense and put it in the consumer's locker. (*Id.*)

Finally, the method by which ReDigi transfers ownership of lawfully purchased iTunes music files that reside on ReDigi's server also does not involve

25

the making of any copies. Instead, the transfer of ownership takes place by what is called an "atomic transaction." (A-694; A-1492) A "transaction" is a set of actions (e.g., insertions, deletions, modifications) that occur on the records of a database. (A-694; A-1491 - 1492) In the context of ReDigi's marketplace service, ReDigi transfers ownership through a set of simultaneous actions that modify the user identifier that regulates access to the underlying electronic records of the transferred iTunes music file from one person to another. (A-694.) These electronic records are distinct from the electronic data that comprises the copyrighted sound recording. (*Id.*)

An atomic transfer of ownership means that all transactions pertaining to the change of user identifier information, which establishes ownership of a particular iTunes music file, takes place at literally the same time or none of the transactions take place at all. (*Id.*) Hence, ReDigi's atomic transaction ensures that there is a true and instantaneous exchange of ownership and possession of the iTunes music file from the seller to the subsequent purchaser. (*Id.*) ReDigi's method of transferring ownership is thus analogous to the transfer of ownership of the contents of a safe deposit box: the bank is able to transfer ownership of the contents of the box simply by changing the key that will provide access the contents of the box.

26

**B.     ReDigi's Transfer Method Does Not Result in the Creation of a New Phonorecord.**

In *Cartoon Network, supra*, this Court ruled that Cablevision's technology was not infringing because it did not result in the creation of new embodiments of the copyrighted television programming that were "fixed" for a sufficient period of time to constitute a "copy" within the meaning of the Copyright Act. 536 F.3d at 127-130. "Given that the data reside in no buffer for more than 1.2 seconds before being automatically overwritten, and in the absence of compelling arguments to the contrary, we believe that the copyrighted works here are not 'embodied' in the buffers for a period of more than transitory duration, and are therefore not "fixed" in the buffers." *Id.* at 130.

The same analysis applies here. Each "block" of data that is read into the buffer as part of the transfer process only resides on the buffers for a less than a second—before it is overwritten by the next block of data. (A-989 - 990) Hence, as in *Cartoon Network*, a "work is not 'fixed' in the buffer, and, as a result, the buffer data is not a 'copy' of the original work whose data is buffered." 536 F.3d at 127. Further, no copies of the transferred "blocks" of data remain in the consumer's computer. Instead, at the moment that a "block" of data is read into the buffer, that block is removed from the music file remaining in the consumer's computer such that the transferred block of data is no longer part of the remaining file. A-690 – 691; A-700 – 701; A-705 – 707; A-1488) ReDigi's transfer method

neither creates any new copies of the iTunes music file nor does it leave the old copy in the consumer's computer. Instead, ReDigi's transfer method *separates* each block of data from the source iTunes music file in the consumer's computer and *transfers* block-by-block the iTunes music file from the consumer's computer to ReDigi's server. (*Id.*)

## III. REDIGI'S TECHNOLOGY PERMITS THE TRANSFER OF OWNERSHIP OF PARTICULAR ITUNES MUSIC FILES IN A MANNER THAT CONFORMS WITH THE FIRST SALE DOCTRINE.

The district court held that the first sale doctrine offered no protection for sellers of iTunes music files because "the first sale defense is limited to material items, like records, that the copyright owner put into the stream of commerce." 934 F.Supp.2d at 655. Based on its erroneous holding that iTunes music files could not satisfy the Copyright Act's definition of "phonorecord," the district court concluded that the first sale doctrine only permitted a consumer to sell her lawfully purchased iTunes music files if the transaction also included the *"lawful owner's sale of her 'particular' phonorecord, be it a computer hard disk, iPod, or other memory device onto which the file was originally downloaded."* *Id*. at 656 (emphasis added)). In essence, the district court interpreted the first sale doctrine to require a customer to sell her computer in order to be able to sell a lawfully purchased iTunes music file.

28

It is well-established that copyright law seeks to "balance . . . the artist's rights to control his [or her] work . . . and the public's need for access" by granting authors certain exclusive rights that are subject to a series of exceptions and limitations. *Stewart v. Abend*, 495 U.S. 207, 209 (1990). The first sale doctrine is one of those limitations. As the Supreme Court explained in *Kirstaeng*, the first sale doctrine "has played an important role in American copyright law" in terms of expanding the public's access to copyrighted goods. 133 S.Ct. at 1363. The first sale doctrine furthers public access by "leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods." *Id.* Thus, the first sale doctrine provides critical legal protection to libraries, used book, music and electronic game shops, swap meets, and other avenues by which purchasers may dispose of their lawfully purchased copyrighted goods. *Id.* at 1364-1365. In light of the first sale doctrine's "broad reach," the Supreme Court has warned against adopting a "cramped reading" of the statutory language. *Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998).

29

**A.** **Consumers Who Lawfully Purchase iTunes Music Files Are "Owners" Of Those Files And Thus Entitled To First Sale Protection.**

By its terms, the first sale doctrine applies to all purchasers who acquire lawful title to copyrighted goods as opposed to mere lawful possession.[6] As the Court stated in *Kirstaeng*, "Section 109(a) now makes clear that a lessee of a copy will not receive 'first sale' protection but one who *owns* a copy *will* receive 'first sale' protection, *provided*, of course, that the copy was '*lawfully made*' and not pirated." 133 S.Ct. at 1361 (emphasis in original). As the Court explained in *Quality King*,

> After the first sale of a copyrighted item "lawfully made under this title," any subsequent purchaser, whether from a domestic or from a foreign reseller, is obviously an 'owner' of that item. Read literally, § 109(a) unambiguously states that such an owner 'is entitled, without the authority of the copyright owner, to sell' that item.

523 U.S. at 145.

It is undisputed that lawful purchasers of iTunes music files from Apple are the owners of those files. The Apple Agreement establishes that Apple was authorized ███████████████████████████████████████

███████████████████████████████████████

---

[6] Whereas the first sale doctrine set forth in section 41 of the 1909 Copyright Act prohibited restrictions on the transfer of "any copy of a copyrighted work the possession of which has been lawfully obtained," Congress amended section 109(a) of 1976 Copyright Act to state that the first sale doctrine applies to "the owner of a particular copy or phonorecord lawfully made under this title or anyone authorized by such owner." 17 U.S.C. § 109(a).

30

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████ *see also* A-192 ("One of the reasons that we

started out [ReDigi's] business model with iTunes is because iTunes sells the title

to the MP3."))  Despite consumers' undisputed ownership of the iTunes music

files, the district court imposed highly burdensome restrictions on their ability to

resell or otherwise dispose of their iTunes music files, and thus violates "'the very

basic concept of copyright law that, once you've sold a copy legally, you can't

restrict its resale.'"  *Kirstaeng*, 133 S.Ct. at 1363.

**B.      The District Court's Ruling Exceeds The Restraints Permitted By the First Sale Doctrine.**

The Supreme Court "first endorsed the first sale doctrine" (*Quality King*,

523 U.S. at 140) in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 28 S.Ct. 722

(1908), where the Court struck down a publisher's attempt to control the prices at

which retail distributors could sell the publisher's copyrighted books.  Bobbs-

Merrill sued R. H. Macy & Co. for copyright infringement based on the

department store's decision to charge roughly ten percent less than the price set by

the publisher.  *Id*. at 342.  The publisher claimed that its resale restrictions were

consistent with "the whole field of the right of exclusive sale" (*id*. at 349) under

31

which a publisher could exercise that right by withholding copies from the marketplace altogether or selling them conditionally reserving "so much of the right as [it] pleases." *Id.*

Though acknowledging that copyright owners could use contract law to impose restrictions on uses of its copyrighted works, the Supreme Court ruled that the publisher could not impose such restrictions under copyright law. "In our view, the copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose, by notice, such as is disclosed in this case, a limitation at which the book shall be sold at retail by future purchasers, with whom there is no privity of contract." *Id.* at 350; *see also Quality King*, 523 U.S. at 143 ("The *Bobbs-Merrill* opinion emphasized the critical distinction between statutory rights and contract rights"). Hence, once the publisher sold copies "in quantities and at a price satisfactory to it[, it] exercised the right to vend," thus exhausting its right to control further dispositions of the particular copies sold. *Bobbs-Merrill*, 210 U.S. at 351.

In *Bobbs-Merrill*, the publisher attempted to set a price floor for all downstream sales of its books. However, *Bobbs-Merrill* drew no distinction between the types of restraints that a copyright holder may impose following the first sale and instead prohibited *all attempts by copyright owners* to impose any

32

copyright-based restrictions on the lawful downstream sales of their copyrighted goods.

This was the way the *Bobbs-Merrill* decision was understood by Congress, which quickly passed legislation incorporating the first sale doctrine in section 27 of the 1909 Copyright Act. In relevant part, section 27 provided that "nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully attained." Act of March 4, 1909, ch. 320, § 41, 35 Stat. 1075, 1041 (codified at 17 USC § 27) (the "1909 Act").

This broad understanding of the first sale doctrine's prohibitions is confirmed by the Fifth Circuit's summary of the first sale doctrine under the 1909 Act:

> [T]he law surrounding the first sale doctrine is clear. The exclusive right to vend a copy of a copyrighted work extends only to the first sale of that copy. *After the first sale of a copy the copyright holder has no control over the occurrence or conditions of further sales of it.* Even if the copyright holder places restrictions on the purchaser in a first sale (such as specifying the permissible uses of the article), the buyer's disregard of the restrictions on resale does not make the buyer or the person who buys in the secondary market liable for infringement. *The first sale thus extinguishes the copyright holder's ability to control the course of copies placed in the stream of commerce.*

*American Int'l Pictures, Inc. v. Foreman*, 5786 F.2d 661, 663-664 (5ᵗʰ Cir. 1978) (citations and footnote omitted; emphasis added). The House Report

33

accompanying the 1976 Copyright Act explains that section 109(a) "restates and confirms the principle . . . established by the court decisions and section 27 of the [1909] law." Hence, section 109(a) continues the first sale doctrine's general prohibition against all types of restraints on an owner's ability to sell or dispose of her lawfully obtained copyrighted good.

Comparison of the severity of the restraints the Supreme Court struck down in *Bobbs-Merrill* with the restraints the district court imposed on resellers of iTunes music files shows why the district court's ruling cannot stand. Whereas the publisher's restrictions raised the price of the book a few pennies above what it would have otherwise sold for, the district court's ruling would require the owner of an iTunes music file to also transfer personal property, such as a computer hard disk, tablet, or iPhone whose value exceeds by hundreds of times the $0.99 price that consumers typically pay to acquire title to their iTunes music file. The district court's ruling is so punitive that it effectively precludes lawful purchasers of iTunes music files from exercising any first sale rights regarding what all sides concede is the consumers' lawfully acquired personal property.

C. **The District Court's Ruling Imposes Anti-Competitive Restraints That Are Prohibited By The First Sale Doctrine.**

As the Supreme Court reminded federal courts in *Kirstaeng*, the first sale doctrine traces its origins to the common law's prohibition against restraints on the alienation of chattels. 133 S.Ct. at 1363-1364. Borrowing from Lord Coke,

34

Justice Breyer's opinion for the Court stated that "[a] law that permits a copyright holder to control the resale or other disposition of a chattel once sold is similarly 'against Trade and Traffi[c], and bargaining and contracting." *Id.* at 1363, quoting1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628).

Continuing, Justice Breyer explained:

> With these last few words, Coke emphasizes the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods. American law too has generally thought that competition, including freedom to resell, can work to the advantage of the consumer. *See, e.g., Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 886, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (restraints with "manifestly anticompetitive effects" are *per se* illegal; others are subject to the rule of reason (internal quotation marks omitted)); 1 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 100, p. 4 (3d ed. 2006) ("[T]he principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively").

*Id.*

The district court's ruling not only restricts purchasers' "freedom to resell" their lawfully purchased iTunes music files, but plainly will have "manifestly anti-competitive effects" by eliminating any meaningful competition from resellers. One does not need an advanced degree in economics to realize that no secondary market for previously purchased iTunes music files can ever develop if consumers are required to give away their computer hard disks as part of any resale of an iTunes music file.

35

In effect, the district court's ruling creates two different markets, only one of which provides any meaningful first sale protections. In the traditional market of purchasing digital music files in CDs and DATs, the first sale doctrine limits the copyright owners' ability to control downstream sales as *consumers need only convey the item purchased from the copyright holder*. By contrast, the district court's ruling tells copyright holders that if they instead distribute their electronic music files over the Internet, they can effectively prevent all downstream sales or transfers of the music files and thereby avoid the pro-competitive effects of the first sale doctrine.

### D. The District Court's Imposition of Additional Burdensome Restraints on the Resale of Lawfully Purchased iTunes Music Files Violates the First Sale Doctrine's Equal Treatment Principle.

Although acknowledging that its ruling "presents obstacles to resale that are different from, and perhaps even more onerous than, those involved in the resale of CDs and cassettes" (934 F.Supp.2d at 656), the district court imposed these highly burdensome restraints without ever examining whether Congress intended such an unequal application of the first sale doctrine. Instead, the district court concluded that it was "left to Congress, and not this Court, to deem [such disparate treatment] outmoded." *Id.*

The district court got it backwards. As the Supreme Court made clear in *Kirtsaeng,* the first sale doctrine embodies what the Court referred to as an "equal

36

treatment principle" (*id.* at 1362) which prohibits the imposition of disparate and excessive first sale limitations.  Moreover, the Supreme Court has already determined there is no reason to believe "that Congress intended either [section] 109(a) or the earlier codifications of the doctrine to limit its broad scope." *Quality King*, 523 U.S. at 152.  Hence, rather than tell ReDigi to seek relief from Congress, the district court should have instead told Capitol that the imposition of such disparate and onerous restraints on the resale of lawfully purchased iTunes music files or downloads violates the first sale doctrine's equal treatment principle.

In *Kirstaeng*, the Court ruled that the first sale doctrine permitted a Thai foreign exchange student studying in the United States to purchase significantly lower-priced English-language copies of the publisher's textbooks sold in Thailand and sell them in the U.S. for substantially lower prices than the publisher was charging U.S. customers.  The publisher claimed that the first sale doctrine did not apply because the "first sale" had occurred outside the United States.  *Kirstaeng*, 133 S.Ct. at 1357-58.  The Court rejected the publisher's arguments and found that any geographic-based limitations on purchasers' ability to dispose of their lawfully purchased copyrighted goods could not be reconciled with the first sale doctrine's "equal treatment principle."  As the Court explained:

> The 'equal treatment' principle, however, is difficult to square with a geographical interpretation of the 'first sale' clause that would grant the holder of an American copyright (perhaps a foreign national . . .) permanent control over the American distribution chain (sales, resales,

gifts, and other distribution) in respect to copies printed abroad but not in respect to copies printed in America. And it is particularly difficult to believe that Congress would have sought this unequal treatment while saying nothing about it and while, in a related clause (the manufacturing phase-out) seeking the opposite kind of policy goal.

*Id*. at 1362. Finding no evidence that Congress intended such a result, the Court reversed and remanded for further proceedings.

Application of the Supreme Court's analysis in *Kirstaeng* to the facts of this case yields a very different result than the one reached by the district court. As was the situation in *Kirstaeng*, the district court here pointed to no evidence showing that Congress intended to impose such significant restrictions on resellers of iTunes music files. Moreover, as discussed in section 1A, above, the district court also ignored Congress' various amendments to the Copyright Act, including the Digital Audio Recording Act and the Digital Performance Right in Sound Recording Act, which accepted the proposition that the distribution of copyrighted works over the Internet satisfied the Copyright Act's requirements of a distribution of a "copy" or "phonorecord." *See Id*. at 1358 ("We also doubt that Congress would have intended to create the practical copyright-related harms with which a geographical interpretation would threaten ordinary scholarly, artistic, commercial and consumer activities"); *see also id*. at 1364-67. In short, as *Kirstaeng* makes clear, the first sale doctrine applies equally to *all* lawfully purchased "copies" or

38

"phonorecords" unless Congress has expressly stated otherwise—which it has not done here.

### E. None of the Policy Reasons Identified by the District Court Warrant the Unequal Treatment of iTunes Music Files Under the First Sale Doctrine.

Capitol argued that ReDigi's technology was not entitled to copyright protection because it "has a direct negative effect" on 'the potential market for or value of the copyrighted work.'" (A-249)  Without citing any evidentiary support, Capitol argued that "the delivery of pristine digital recordings that are of equal quality to 'new' recordings [citation omitted], but which are sold at 'used' prices supplants the market for legitimate digital distribution."  (*Id.*)  Not surprisingly, this is not the first time that copyright holders have asserted that equal application of the first sale doctrine will adversely affect their existing financial arrangements. Similar arguments were made in *Kirstaeng* where the publisher argued that removal of geographical-based restrictions would "make it difficult, perhaps impossible" for publishers to charge different prices for the same book in different geographical markets.  The Court's response to the publisher's assertion in *Kirstaeng* is equally appropriate here:

> The Constitution describes the nature of American copyright law by providing Congress with the power to 'secur[e]' to '[a]uthors' 'for limited [t]imes' the '*exclusive [r]ight to their . . . [w]ritings.*"  Art. I, § 8, cl. 8.  The Founders, too, discussed the need to grant an author a limited right to exclude competition.  [Citations omitted]  But the Constitution's language nowhere suggests that its limited exclusive

39

right should include a right to divide markets or a concomitant right to charge different purchasers different prices for the same book, say to increase or to maximize gain. Neither, to our knowledge, did any Founder make any such suggestion. We have found no precedent suggesting a legal preference for interpretations of copyright statutes that would provide for market divisions. [Citations omitted] [¶] To the contrary, Congress enacted a copyright law that through the 'first sale' doctrine limits copyright holders' ability to divide domestic markets. And that limitation is consistent with antitrust laws that ordinarily forbid market divisions. [Citations omitted]

133 S.Ct. 1370-1371 (emphasis in original).

The first sale doctrine likewise prevents Capitol from dividing the market for electronic music files by prohibiting the development of a secondary market if the phonorecord embodying the music file is delivered by Apple over the Internet while permitting a secondary market if the phonorecord is a CD or DAT tape delivered by Amazon. In either case, the purchaser has acquired ownership of a lawful copy of the copyrighted work and is entitled to sell or otherwise dispose of that copy in accordance with the terms of the first sale doctrine.

Nor is there reason to believe that allowance of a *bona fide* secondary market in iTunes music files or downloads will have an adverse impact on the market on Capitol's sound recordings by reducing the incentives from creating new sound recordings. Indeed, substantial evidence supports the conclusion that "secondary markets are better at price discrimination and at maximizing social welfare than copyright owners." Aaron Perzanowski and Jason Schultz, *Digital Exhaustion*, 58 UCLA L. Rev. 889, 895 (2011) ; *see also* Anindya Ghose, et. al,

40

*Internet Exchanges for Used Books: An Empirical Analysis of Product Cannibalization and Welfare Impact*, 17 Info. Sys. Res. 3 (2006) (noting that 84% of the used books purchased from Amazon.com came from buyers who would not have otherwise purchased a new book at the price set by the copyright owner). Hence, far from reducing the market for copyrighted goods, the first sale doctrine furthers the public interest by enhancing the affordability and availability of copyrighted works.

Equally unavailing is Capitol's contention that the first sale doctrine is inapplicable because "[t]here is . . . no such thing as a 'used' digital file, akin to a dog-eared book or scratched CD," (A-232) Capitol's argument simply misses the mark because nothing in the Copyright Act limits the first sale doctrine to copyrighted goods that *are damaged or decrease in value*.[7] The first sale doctrine equally protects the purchaser of copyrighted collectibles (such as original Mickey Mouse lithographs) and original pieces of fine art—which are often purchased in the hope of being able to resell at a profit—as it does the purchaser of a dog-eared book or scratched CD.

---

[7] Capitol's argument also ignores the fact that the digital sound recordings embedded in used CDs can be as "pristine" as that of a music file transferred over ReDigi's system. Even Capitol does not dispute that the first sale doctrine protects consumers who wish to sell their lawfully purchased CDs or DAT tapes, regardless of the acoustic quality of the music being transferred.

41

Capitol's reliance on the Register of Copyright's 2001 Report recommending against recognition of an "electronic first sale doctrine" rings hollow because it was written at a time when it was believed that the only method by which digital files could be transferred over the Internet was by the traditional "copy and delete" method. (A-253) As the Register explained, "unlike the traditional circumstances of a first sale transfer, the recipient obtains a new copy, not the same one with which the sender began [while] . . . *the sender retains the source copy,*" which "implicates the copyright owner's reproduction right as well as the distribution right." *See* U.S. Copyright Office, *DMCA Section 104 Report* 79 (2001) ( "2001 Report"). In short, the "digital first sale" issue addressed by the Register was whether the Copyright Act should be amended to permit the making of multiple copies of copyrighted works that could then be shared with others over the Internet. As discussed above, since issuing the 2001 Report, the Register now recognizes that "the digital transfer of copies or phonorecords in electronic formats and is not limited to the conveyance of tangible objects." 2016 Report at p. 4; *see* section IB, *supra.* In short, the 2001 Report does not support Capitol because it was based on an evaluation of a different technology than the one used by ReDigi.

## IV. REDIGI'S TECHNOLOGY IS PROTECTED BY THE FAIR USE DOCTRINE

The Supreme Court's decision in *Kirstaeng* leaves no doubt that the first sale doctrine applies to any transaction in which a purchaser acquires lawful ownership

of the copyrighted article. *See* 133 S.Ct. at 1361 "[O]ne who *owns* a copy *will* receive 'first sale' protection, *provided*, of course, that the copy was '*lawfully made*' and not pirated" (emphasis in original)). Indeed, Justice Breyer's opinion underscored the first sale doctrine's "importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of these goods. *Id.* at 1363.

The district court's opinion results in precisely the opposite state of affairs. Rather than allowing lawful purchasers of iTunes music files to convey their valid ownership interest in those files, the district court's decision effectively prohibits the exercise of the purchaser's first sale rights by requiring that the purchaser also transfer additional valuable personal property (i.e., the consumer's computer hard disk) that was not part of the transaction in which the purchaser obtained ownership of the iTunes music file. Thus, even if this Court concludes that ReDigi's technology infringes any of Capitol's rights, ReDigi respectfully submits that such infringements are permitted under the fair use doctrine because they further the public interest by extending reasonable first sale protection to all lawful owners of copyrighted iTunes music files.

In *Authors Guild v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014), this Court stated that fair use protection is not limited to so-called "transformative" uses of a copyright owner's work. *See id.* 101-02. Indeed, this Court made clear that even

43

the making of exact copies of a copyrighted work can be fair use if it furthers other important copyright interests. Thus, this Court found that the defendant's preservation of copyrighted books in digital form was a fair use because it furthered other important interests identified by Congress, such as enabling "print-disabled patrons" access to works that were otherwise not readily available to them in current formats. Observing that the "[m]aking of a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of fair use," (*id.*) this Court concluded that the factors set forth in section 107 favored a finding of fair use.

Likewise here, ReDigi's technology furthers the important copyright interest of extending first sale protection to lawful owners of iTunes music files or downloads by allowing them to transfer ownership of the original source iTunes music file without making any reproductions of the file itself. At the same time, ReDigi includes substantial safeguards against the misuse of its technology.

The undisputed evidence before the district court showed that consumers are required to download ReDigi's Media Manager in order to access ReDigi's services. (A-687; A-698; A-1485 - 1486) The Media Manager scans all music files on a consumer's computer and connected storage devices. (*Id.*) The Media Manager is able to identify the original source file that the consumer purchased from iTunes from any other reproductions that the consumer may have made. (*Id.*)

44

Before a consumer can transfer an original source iTunes music file to ReDigi's server, the consumer agrees to allow ReDigi to delete all reproductions of that file residing on the consumer's computer or connected devices.  (A-1485 – 1486; A-1490)  After the original source file is transferred to ReDigi's server, the Media Manager continues to monitor the consumer's computer and connected devices (as well as removable devices when they become attached) for the creation, deletion or renaming of music files. (A-687; A-689 - 690)  ReDigi conducts such monitoring to ensure that the iTunes music files offered for sale on ReDigi's marketplace (1) are the original source file lawfully purchased from Apple and (2) are the only instance of that music file on the consumer's computer or connected devices.  (A-694 – 695; A-707; A-1486)

Accordingly, to the extent the Court finds that ReDigi's technology infringes any of Capitol's rights, such conduct is nonetheless protected under the fair use doctrine because it furthers the public interest vouchsafed by the fair use doctrine.

## CONCLUSION

The district court's flawed copyright analysis led it to believe it could resolve Capitol's infringement claims even though it knew there were material disputes regarding the capabilities of ReDigi's transfer technology.  ReDigi is entitled to demonstrate to the trier of fact that its technology indeed allows

consumers to transfer their ownership of iTunes music files in a manner that does not infringe Capitol's reproduction rights and comports with the first sale doctrine.

For all of the reasons set forth above, ReDigi respectfully submits that the district court's decision granting summary judgment to Capitol must be reversed.

Dated:  Los Angeles, California
February  7 , 2017

Respectfully submitted,

 /s/ Robert C. Welsh
Robert C. Welsh
C. Dennis Loomis
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA  90025
Tel. (310) 820-8800
Fax (310) 820-8859

*Attorneys for Defendants ReDigi Inc.,*
*John Ossenmacher and Larry Rudolph*
*aka Lawrence S. Rogel*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 10,814 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated: Los Angeles, California
   February 7, 2017

Respectfully submitted,

/s/ Robert C. Welsh
Robert C. Welsh
C. Dennis Loomis
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA  90025
Tel. (310) 820-8800
Fax (310) 820-8859

*Attorneys for Defendants ReDigi Inc.,
John Ossenmacher and Larry Rudolph
aka Lawrence S. Rogel*

# SPECIAL APPENDIX

**TABLE OF CONTENTS**

PAGE

Memorandum and Order of the Honorable Richard J. Sullivan,
dated March 30, 2013 ................................................................... SPA-1

Stipulated Final Judgment Subject to Reservation of Right to Appeal,
dated June 3, 2016........................................................................ SPA-19

**SPA-1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————

No. 12 Civ. 95 (RJS)

——————————————

CAPITOL RECORDS, LLC,

Plaintiff,

VERSUS

REDIGI INC.,

Defendant.

——————————————

MEMORANDUM AND ORDER
March 30, 2013

——————————————

RICHARD J. SULLIVAN, District Judge:

Capitol Records, LLC ("Capitol"), the recording label for such classic vinyls as Frank Sinatra's "Come Fly With Me" and The Beatles' "Yellow Submarine," brings this action against ReDigi Inc. ("ReDigi"), a twenty-first century technology company that touts itself as a "virtual" marketplace for "pre-owned" digital music. What has ensued in a fundamental clash over culture, policy, and copyright law, with Capitol alleging that ReDigi's web-based service amounts to copyright infringement in violation of the Copyright Act of 1976 (the "Copyright Act"), 17 U.S.C. § 101, *et seq.* Now before the Court are Capitol's motion for partial summary judgment and ReDigi's motion for summary judgment, both filed pursuant to Federal Rule of Civil Procedure 56. Because this is a court of law and not a congressional subcommittee or technology blog, the issues are narrow, technical, and purely legal. Thus, for the reasons that follow, Capitol's motion is granted and ReDigi's motion is denied.

### I. BACKGROUND

#### A. Facts

ReDigi markets itself as "the world's first and only online marketplace for digital used music."[1] (Capitol 56.1 Stmt., Doc. No. 50

---

[1] The facts are taken from the pleadings, the parties' Local Civil Rule 56.1 Statements, the affidavits submitted in connection with the instant motions, and the exhibits attached thereto. The facts are undisputed unless otherwise noted. Where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no

**SPA-2**

("Cap. 56.1"), ¶ 6.) Launched on October 13, 2011, ReDigi's website invites users to "sell their legally acquired digital music files, and buy used digital music from others at a fraction of the price currently available on iTunes." (*Id.* ¶¶ 6, 9.) Thus, much like used record stores, ReDigi permits its users to recoup value on their unwanted music. Unlike used record stores, however, ReDigi's sales take place entirely in the digital domain. (*See* ReDigi Reply 56.1 Stmt., Doc. No. 83 ("RD Rep. 56.1"), 4 ¶ 16.)

To sell music on ReDigi's website, a user must first download ReDigi's "Media Manager" to his computer. (ReDigi 56.1 Stmt., Doc. No. 56 ("RD 56.1"), ¶ 8.) Once installed, Media Manager analyzes the user's computer to build a list of digital music files eligible for sale. (*Id.*) A file is eligible only if it was purchased on iTunes or from another ReDigi user; music downloaded from a CD or other file-sharing website is ineligible for sale. (*Id.*) After this validation process, Media Manager continually runs on the user's computer and attached devices to ensure that the user has not retained music that has been sold or uploaded for sale. (*Id.* ¶ 10.) However, Media Manager cannot detect copies stored in other locations. (Cap. 56.1 ¶¶ 59-61, 63; *see* Capitol Reply 56.1 Stmt., Doc. No. 78 ("Cap. Rep. 56.1"), ¶ 10.) If a copy is detected, Media Manager prompts the user to delete the file. (Cap. 56.1 ¶ 64.) The file is not deleted automatically or involuntarily, though ReDigi's policy is to suspend the accounts of users who refuse to comply. (*Id.*)

After the list is built, a user may upload any of his eligible files to ReDigi's "Cloud Locker," an ethereal moniker for what is, in fact, merely a remote server in Arizona. (RD 56.1 ¶¶ 9, 11; Cap. 56.1 ¶ 22.)

ReDigi's upload process is a source of contention between the parties. (*See* RD 56.1 ¶¶ 14-23; Cap. Rep. 56.1 ¶¶ 14-23.) ReDigi asserts that the process involves "migrating" a user's file, packet by packet – "analogous to a train" – from the user's computer to the Cloud Locker so that data does not exist in two places at any one time.[2] (RD 56.1 ¶¶ 14, 36.) Capitol asserts that, semantics aside, ReDigi's upload process "necessarily involves copying" a file from the user's computer to the Cloud Locker. (Cap. Rep. 56.1 ¶ 14.) Regardless, at the end of the process, the digital music file is located in the Cloud Locker and not on the user's computer. (RD 56.1 ¶ 21.) Moreover, Media Manager deletes any additional copies of the file on the user's computer and connected devices. (*Id.* ¶ 38.)

Once uploaded, a digital music file undergoes a second analysis to verify eligibility. (Cap. 56.1 ¶¶ 31-32.) If ReDigi determines that the file has not been tampered with or offered for sale by another user, the file is stored in the Cloud Locker, and the user is given the option of simply storing and streaming the file for personal use or offering it for sale in ReDigi's marketplace. (*Id.* ¶¶ 33-37.) If a user chooses to sell his digital music file, his access to the file is terminated and transferred to the new owner at the time of purchase. (*Id.* ¶ 49.) Thereafter, the new owner can store the file in the Cloud Locker, stream it, sell it, or download it to her computer and other devices. (*Id.* ¶ 50.) No money changes hands in these transactions. (RD Rep. 56.1 5 ¶ 18.) Instead, users buy music with credits they either purchased

---

admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

[2] A train was only one of many analogies used to describe ReDigi's service. At oral argument, the device was likened to the Star Trek transporter – "Beam me up, Scotty" – and Willy Wonka's teleportation device, Wonkavision. (Tr., dated Oct. 5, 2012 ("Tr."), 10:2-12; 28:15-20.)

**SPA-3**

from ReDigi or acquired from other sales. (*Id.*)  ReDigi credits, once acquired, cannot be exchanged for money. (*Id.*)  Instead, they can only be used to purchase additional music. (*Id.*)

To encourage activity in its marketplace, ReDigi initially permitted users to preview thirty-second clips and view album cover art of songs posted for sale pursuant to a licensing agreement with a third party. (*See* RD 56.1 ¶¶ 73-78.)  However, shortly after its launch, ReDigi lost the licenses. (*Id.*) Accordingly, ReDigi now sends users to either YouTube or iTunes to listen to and view this promotional material. (*Id.* ¶¶ 77, 79.)  ReDigi also offers its users a number of incentives. (Cap. 56.1 ¶ 39.)  For instance, ReDigi gives twenty-cent credits to users who post files for sale and enters active sellers into contests for prizes. (*Id.* ¶¶ 39, 42.)  ReDigi also encourages sales by advising new users via email that they can "[c]ash in" their music on the website, tracking and posting the titles of sought after songs on its website and in its newsletter, notifying users when they are low on credits and advising them to either purchase more credits or sell songs, and connecting users who are seeking unavailable songs with potential sellers. (*Id.* ¶¶ 39-48.)

Finally, ReDigi earns a fee for every transaction. (*Id.* ¶ 54.)  ReDigi's website prices digital music files at fifty-nine to seventy-nine cents each. (*Id.* ¶ 55.)  When users purchase a file, with credits, 20% of the sale price is allocated to the seller, 20% goes to an "escrow" fund for the artist, and 60% is retained by ReDigi.[3] (*Id.*)

---

[3] On June 11, 2012, ReDigi launched ReDigi 2.0, new software that, when installed on a user's computer, purportedly directs the user's new iTunes purchases to upload from iTunes directly to the Cloud Locker. (RD 56.1 ¶¶ 40-41.)  Accordingly, while access may transfer from user to user upon resale, the file is never moved from its initial location

## B.  Procedural History

Capitol, which owns a number of the recordings sold on ReDigi's website, commenced this action by filing the Complaint on January 6, 2012. (*See* Complaint, dated Jan. 5, 2012, Doc. No. 1 ("Compl."); Cap. 56.1 ¶¶ 68-73.)  In its Complaint, Capitol alleges multiple violations of the Copyright Act, 17 U.S.C. § 101, *et seq.*, including direct copyright infringement, inducement of copyright infringement, contributory and vicarious copyright infringement, and common law copyright infringement. (Compl. ¶¶ 44-88.) Capitol seeks preliminary and permanent injunctions of ReDigi's services, as well as damages, attorney's fees and costs, interest, and any other appropriate relief. (*Id.* at 17-18.)  On February 6, 2012, the Court denied Capitol's motion for a preliminary injunction, finding that Capitol had failed to establish irreparable harm. (Doc. No. 26.)

On July 20, 2012, Capitol filed its motion for partial summary judgment on the claims that ReDigi directly and secondarily infringed Capitol's reproduction and distribution rights. (Doc. No. 48.)  ReDigi filed its cross-motion the same day, seeking summary judgment on all grounds of liability, including ReDigi's alleged infringement of Capitol's performance and display rights.[4]  (Doc. No. 54.)  Both parties

---

in the Cloud Locker. (*Id.* ¶¶ 44-52.)  However, because ReDigi 2.0 launched after Capitol filed the Complaint and mere days before the close of discovery, the Court will not consider it in this action. (*See* Tr. 19:2-20:3.)

[4] ReDigi's arguments in this round of briefing differ markedly from those it asserted in opposition to Capitol's motion for a preliminary injunction. (*See* ReDigi Opp'n to Prelim. Inj., dated Jan. 27, 2012, Doc. No. 14 ("ReDigi Opp'n to PI").)  For instance, ReDigi no longer asserts an "essential step defense," nor does it argue that "copying" to the Cloud Locker for storage is protected by the fair use defense. (*Id.* at

Case 16-2321, Document 55, 02/07/2017, 1963759, Page60 of 90

**SPA-4**

Case 1:12-cv-00095-RJS   Document 109   Filed 03/30/13   Page 4 of 18

responded on August 14, 2012 and replied on August 24, 2012. (Doc. Nos. 76, 79, 87, 90.) The Court heard oral argument on October 5, 2012.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a court may not grant a motion for summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that it is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *accord Anderson*, 477 U.S. at 249. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted).

Inferences and burdens of proof on cross-motions for summary judgment are the same as those for a unilateral motion. *See Straube v. Fla. Union Free Sch. Dist.*, 801 F. Supp.

1164, 1174 (S.D.N.Y. 1992). "That is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts." *U.S. Underwriters Ins. Co. v. Roka LLC*, No. 99 Civ. 10136 (AGS), 2000 WL 1473607, at *3 (S.D.N.Y. Sept. 29, 2000); *see Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988).

## III. DISCUSSION

Section 106 of the Copyright Act grants "the owner of copyright under this title" certain "exclusive rights," including the right "to reproduce the copyrighted work in copies or phonorecords," "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership," and to publicly perform and display certain copyrighted works. 17 U.S.C. §§ 106(1), (3)-(5). However, these exclusive rights are limited by several subsequent sections of the statute. Pertinently, Section 109 sets forth the "first sale" doctrine, which provides that "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." *Id.* § 109(a). The novel question presented in this action is whether a digital music file, lawfully made and purchased, may be resold by its owner through ReDigi under the first sale doctrine. The Court determines that it cannot.

### A. Infringement of Capitol's Copyrights

To state a claim for copyright infringement, a plaintiff must establish that it owns a valid copyright in the work at issue and that the defendant violated one of the exclusive rights the plaintiff holds in the work. *Twin Peaks Prods., Inc. v. Publ'ns*

---

9-14.) ReDigi has also abandoned its argument that the Digital Millenium Copyright Act, 17 U.S.C. § 512, bars Capitol's claim. (*Id.* at 22.) As such, the Court will consider only those arguments made in the instant motions.

4

**SPA-5**

*Int'l, Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). It is undisputed that Capitol owns copyrights in a number of the recordings sold on ReDigi's website. (*See* Cap. 56.1 ¶¶ 68-73; RD Rep. 56.1 18-19, ¶¶ 68-73; Decl. of Richard S. Mandel, dated July 19, 2012, Doc. No. 52 ("Mandel Decl."), ¶ 16, Ex. M; Decl. of Alasdair J. McMullan, dated July 19, 2012, Doc. No. 51 ("McMullan Decl."), ¶¶ 3-5, Ex. 1.) It is also undisputed that Capitol did not approve the reproduction or distribution of its copyrighted recordings on ReDigi's website. Thus, if digital music files are "reproduce[d]" and "distribute[d]" on ReDigi's website within the meaning of the Copyright Act, Capitol's copyrights have been infringed.

### 1. Reproduction Rights

Courts have consistently held that the unauthorized duplication of digital music files over the Internet infringes a copyright owner's exclusive right to reproduce. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001). However, courts have not previously addressed whether the unauthorized transfer of a digital music file over the Internet – where only one file exists before and after the transfer – constitutes reproduction within the meaning of the Copyright Act. The Court holds that it does.

The Copyright Act provides that a copyright owner has the exclusive right "to reproduce the copyrighted work *in . . . phonorecords*." 17 U. S. C. § 106(1) (emphasis added). Copyrighted works are defined to include, *inter alia*, "sound recordings," which are "works that result from the fixation of a series of musical, spoken, or other sounds." *Id.* § 101. Such works are distinguished from their material

embodiments. These include phonorecords, which are the "*material objects* in which sounds . . . are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." *Id.* § 101 (emphasis added). Thus, the plain text of the Copyright Act makes clear that reproduction occurs when a copyrighted work is fixed in a new *material object*. *See Matthew Bender & Co., Inc. v. W. Pub. Co.*, 158 F.3d 693, 703 (2d Cir. 1998).

The legislative history of the Copyright Act bolsters this reading. The House Report on the Copyright Act distinguished between sound recordings and phonorecords, stating that "[t]he copyrightable work comprises the aggregation of sounds and not the tangible medium of fixation. Thus, 'sound recordings' as copyrightable subject matter are distinguished from 'phonorecords[,]' the latter being physical objects in which sounds are fixed." H.R. Rep. No. 94-1476, at 56 (1976). Similarly, the House and Senate Reports on the Act both explained:

> Read together with the relevant definitions in [S]ection 101, the right "to reproduce the copyrighted work in copies or phonorecords" means the right to produce a material object in which the work is duplicated, transcribed, imitated, or simulated in a fixed form from which it can be "perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."

*Id.* at 61; S. Rep. No. 94-473, at 58 (1975). Put differently, the reproduction right is the exclusive right to embody, and to prevent others from embodying, the copyrighted work (or sound recording) in a new material object (or phonorecord). *See* Nimmer on

**SPA-6**

Copyright § 8.02 (stating that "in order to infringe the reproduction right, the defendant must embody the plaintiff's work in a 'material object'").

Courts that have dealt with infringement on peer-to-peer ("P2P") file-sharing systems provide valuable guidance on the application of this right in the digital domain. For instance, in *London-Sire Records, Inc. v. John Doe 1*, the court addressed whether users of P2P software violated copyright owners' distribution rights. 542 F. Supp. 2d 153, 166 & n.16 (D. Mass. 2008). Citing the "material object" requirement, the court expressly differentiated between the copyrighted work – or digital music file – and the phonorecord – or "appropriate segment of the hard disk" that the file would be embodied in following its transfer. *Id.* at 171. Specifically,

> [w]hen a user on a [P2P] network downloads a song from another user, he receives into his computer a digital sequence representing the sound recording. That sequence is magnetically encoded on a segment of his hard disk (or likewise written on other media). With the right hardware and software, the downloader can use the magnetic sequence to *reproduce* the sound recording. The electronic file (or, perhaps more accurately, the appropriate segment of the hard disk) is therefore a "phonorecord" within the meaning of the statute.

*Id.* (emphasis added). Accordingly, when a user downloads a digital music file or "digital sequence" to his "hard disk," the file is "reproduce[d]" on a new phonorecord within the meaning of the Copyright Act. *Id.*

This understanding is, of course, confirmed by the laws of physics. It is simply impossible that the same "material object" can be transferred over the Internet. Thus, logically, the court in *London-Sire* noted that the Internet transfer of a file results in a material object being "created elsewhere at its finish." *Id.* at 173. Because the reproduction right is necessarily implicated when a copyrighted work is embodied in a new material object, and because digital music files must be embodied in a new material object following their transfer over the Internet, the Court determines that the embodiment of a digital music file on a new hard disk is a reproduction within the meaning of the Copyright Act.

This finding holds regardless of whether one or multiple copies of the file exist. *London-Sire*, like all of the P2P cases, obviously concerned multiple copies of one digital music file. But that distinction is immaterial under the plain language of the Copyright Act. Simply put, it is the creation of a *new* material object and not an *additional* material object that defines the reproduction right. The dictionary defines "reproduction" to mean, *inter alia*, "to produce again" or "to cause to exist again *or* anew." *See Merriam-Webster Collegiate Edition* 994 (10th ed. 1998) (emphasis added). Significantly, it is not defined as "to produce again while the original exists." Thus, the right "to reproduce the copyrighted work in . . . phonorecords" is implicated whenever a sound recording is fixed in a new material object, regardless of whether the sound recording remains fixed in the original material object.

Given this finding, the Court concludes that ReDigi's service infringes Capitol's reproduction rights under any description of the technology. ReDigi stresses that it

6

"migrates" a file from a user's computer to its Cloud Locker, so that the same file is transferred to the ReDigi server and no copying occurs.[5]   However, even if that were the case, the fact that a file has moved from one material object – the user's computer – to another – the ReDigi server – means that a reproduction has occurred. Similarly, when a ReDigi user downloads a new purchase from the ReDigi website to her computer, yet another reproduction is created.   It is beside the point that the original phonorecord no longer exists.   It matters only that a new phonorecord has been created.

ReDigi struggles to avoid this conclusion by pointing to *C.M. Paula Co. v. Logan*, a 1973 case from the Northern District of Texas where the defendant used chemicals to lift images off of greeting cards and place them on plaques for resale.  355 F. Supp. 189, 190 (N.D. Tex. 1973); (*see* ReDigi Mem. of Law, dated July 20, 2012, Doc. No. 55 ("ReDigi Mem."), at 13).  The court determined that infringement did not occur

because "should defendant desire to make one hundred ceramic plaques . . . , defendant would be required to purchase one hundred separate . . . prints." *C.M. Paula*, 355 F. Supp. at 191.  ReDigi argues that, like the defendant in *C.M. Paula*, its users must purchase a song on iTunes in order to sell a song on ReDigi.   (ReDigi Mem. 13.) Therefore, no "duplication" occurs.  *See C.M. Paula*, 355 F. Supp. at 191 (internal quotation marks omitted).   ReDigi's argument is unavailing.   Ignoring the questionable merits of the court's holding in *C.M. Paula*, ReDigi's service is distinguishable from the process in that case. There, the copyrighted print, or material object, was lifted from the greeting card and transferred in toto to the ceramic tile; no new material object was created.   By contrast, ReDigi's service by necessity creates a new material object when a digital music file is either uploaded to or downloaded from the Cloud Locker.

ReDigi also argues that the Court's conclusion would lead to "irrational" outcomes, as it would render illegal any movement of copyrighted files on a hard drive, including relocating files between directories and defragmenting.   (ReDigi Opp'n, dated Aug. 14, 2012, Doc. No. 79 ("ReDigi Opp'n"), at 8.)   However, this argument is nothing more than a red herring. As Capitol has conceded, such reproduction is almost certainly protected under other doctrines or defenses, and is not relevant to the instant motion. (Cap. Reply, dated Aug. 24, 2012, Doc. No. 87 ("Cap. Reply"), at 5 n.1.)

Accordingly, the Court finds that, absent the existence of an affirmative defense, the sale of digital music files on ReDigi's website infringes Capitol's exclusive right of reproduction.

---

[5]  It bears noting that ReDigi made numerous admissions to the contrary at the preliminary injunction stage.  For instance, in its opposition to Capitol's motion, ReDigi stated that, "The only *copying* which takes place in the ReDigi service occurs when a user uploads music files to the ReDigi Cloud, . . . or downloads music files from the user's Cloud Locker."  (*See* ReDigi Opp'n to PI at 9 (emphasis added).)  ReDigi also stated that, after a digital music file was uploaded to the Cloud Locker, "the copy from which it was made was actually *deleted* from the user's machine."  (*Id.* at 14 (emphasis added).)  ReDigi's officers made similar statements in their depositions, and ReDigi's patent application for its upload technology states that "to be offered for sale, [a music file] is first *copied* to the remote server and stored on the disc."  (*See* Capitol Mem. of Law, dated July 20, 2012, Doc. No. 49 ("Cap. Mem."), at 8-9, n.6 (emphasis added).)  But, as earlier stated, these semantic distinctions are immaterial as even ReDigi's most recent description of its service runs afoul of the Copyright Act.

**SPA-8**

### 2. Distribution Rights

In addition to the reproduction right, a copyright owner also has the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership." 17 U. S. C. § 106(3). Like the court in *London-Sire*, the Court agrees that "[a]n electronic file transfer is plainly within the sort of transaction that § 106(3) was intended to reach [and] . . . fit[s] within the definition of 'distribution' of a phonorecord." *London-Sire*, 542 F. Supp. 2d at 173-74. For that reason, "courts have not hesitated to find copyright infringement by distribution in cases of file-sharing or electronic transmission of copyrighted works." *Arista Records LLC v. Greubel*, 453 F. Supp. 2d 961, 968 (N.D. Tex. 2006) (collecting cases); *see, e.g.*, *Napster*, 239 F.3d at 1014. Indeed, in *New York Times Co., Inc. v. Tasini*, the Supreme Court stated it was "clear" that an online news database violated authors' distribution rights by selling electronic copies of their articles for download. 533 U.S. 483, 498 (2001).

There is no dispute that sales occurred on ReDigi's website. Capitol has established that it was able to buy more than one-hundred of its own recordings on ReDigi's webite, and ReDigi itself compiled a list of its completed sales of Capitol's recordings. (Cap. 56.1 ¶¶ 68-73; RD Rep. 56.1 ¶¶ 68-73.) ReDigi, in fact, does not contest that distribution occurs on its website – it only asserts that the distribution is protected by the fair use and first sale defenses. (*See, e.g.*, ReDigi Opp'n 15 (noting that "any distributions . . . which occur on the ReDigi marketplace are protected").)

Accordingly, the Court concludes that, absent the existence of an affirmative defense, the sale of digital music files on ReDigi's website infringes Capitol's exclusive right of distribution.[6]

### 3. Performance and Display Rights

Finally, a copyright owner has the exclusive right, "in the case of . . . musical . . . works, to perform the copyrighted work publicly." 17 U. S. C. § 106(4). Public performance includes transmission to the public regardless of "whether the members of the public . . . receive it in the same place or in separate places and at the same time or at different times." *Id.* § 101. Accordingly, audio streams are performances because a "stream is an electronic transmission that renders the musical work audible as it is received by the client-computer's temporary memory. This transmission, like a television or radio broadcast, is a performance because there is a playing of the song that is perceived simultaneously with the transmission." *United States v. Am. Soc. Of Composers, Authors, & Publishers*, 627 F.3d 64, 74 (2d Cir. 2010). To state a claim for infringement of the performance right, a plaintiff must establish that (1) the public performance or display of the copyrighted work was for profit, and (2) the defendant lacked authorization from the plaintiff or the

---

[6] Capitol argues that ReDigi also violated its distribution rights simply by making Capitol's recordings available for sale to the public, regardless of whether a sale occurred. (*See* Cap. Mem. 11 n.8 (citing *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 201 (4th Cir. 1997)). However, a number of courts, including one in this district, have cast significant doubt on this "make available" theory of distribution. *See, e.g.*, *Elektra Entm't Grp., Inc. v. Barker*, 551 F. Supp. 2d 234, 243 (S.D.N.Y. 2008) ("[T]he support in the case law for the "make available" theory of liability is quite limited."); *London-Sire*, 542 F. Supp. 2d at 169 ("[T]he defendants cannot be liable for violating the plaintiffs' distribution right unless a 'distribution' actually occurred."). In any event, because the Court concludes that actual sales on ReDigi's website infringed Capitol's distribution right, it does not reach this additional theory of liability.

plaintiff's representative.  *See Broad. Music, Inc. v. 315 W. 44th St. Rest. Corp.*, No. 93 Civ. 8082 (MBM), 1995 WL 408399, at *2 (S.D.N.Y. July 11, 1995).

The copyright owner also has the exclusive right, "in the case of . . . pictorial [and] graphic . . . works[,] . . . to display the copyrighted work publicly."   17 U.S.C. § 106(5).        Public display includes "show[ing] a copy of [a work], either directly or by means of a film, slide, television image, or any other device or process."  *Id.* § 101.  The Ninth Circuit has held that the display of a photographic image on a computer may implicate the display right, though infringement hinges, in part, on where the image was hosted. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007).

Capitol alleges that ReDigi infringed its copyrights by streaming thirty-second song clips and exhibiting album cover art to potential buyers.     (Compl.  ¶¶ 25-26.) ReDigi counters that it only posted such content pursuant to a licensing agreement and within the terms of that agreement. (ReDigi Mem. 24-25.)  ReDigi also asserts that it promptly removed the content when its licenses were terminated, and instead sent users to YouTube or iTunes for previews. (*Id.*)   Capitol, in response, claims that ReDigi's use violated the terms of those licenses and did not cease at the time the licenses were terminated.  (*Compare* RD 56.1 ¶¶ 73-79, *with* Cap. Rep. 56.1 ¶¶ 73-79.)  As such, there are material disputes as to the source of the content, whether ReDigi was authorized to transmit the content, when authorization was or was not revoked, and when ReDigi ceased providing the content. Because the Court cannot determine whether ReDigi infringed Capitol's display and performance rights on the present record, ReDigi's motion for summary judgment on

its alleged infringement of these exclusive rights is denied.

## B.  Affirmative Defenses

Having concluded that sales on ReDigi's website infringe Capitol's exclusive rights of reproduction and distribution, the Court turns to whether the fair use or first sale defenses excuse that infringement.  For the reasons set forth below, the Court determines that they do not.

### 1.  Fair Use

"The ultimate test of fair use . . . is whether the copyright law's goal of 'promot[ing] the Progress of Science and useful Arts' would be better served by allowing the use than by preventing it." *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998) (quoting U.S. Const., art. I, § 8, cl. 8). Accordingly, fair use permits reproduction of copyrighted work without the copyright owner's consent "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107.  The list is not exhaustive but merely illustrates the types of copying typically embraced by fair use.  *Castle Rock Entm't, Inc.*, 150 F.3d at 141.  In addition, four statutory factors guide courts' application of the doctrine.  Specifically, courts look to:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work;  (3)   the   amount   and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use

upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  Because fair use is an "equitable rule of reason," courts are "free to adapt the doctrine to particular situations on a case-by-case basis." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 n.31 (1984) (quoting H. Rep. No. 94-1476, at 65-66); *see Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*, 621 F.2d 57, 60 (2d Cir. 1980).

On the record before it, the Court has little difficulty concluding that ReDigi's reproduction and distribution of Capitol's copyrighted works falls well outside the fair use defense.  ReDigi obliquely argues that uploading to and downloading from the Cloud Locker for storage and personal use are protected fair use.[7]  (*See* ReDigi Mem. 15.)  Significantly, Capitol does not contest that claim.  (*See* Tr. 12:8-23.)  Instead, Capitol asserts only that uploading to and downloading from the Cloud Locker *incident to sale* fall outside the ambit of fair use.  The Court agrees.  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 124 (2d Cir. 2010) (rejecting application of fair use to user uploads and downloads on P2P file-sharing network).

Each of the statutory factors counsels against a finding of fair use.  The first factor requires the Court to determine whether ReDigi's use "transforms" the copyrighted work and whether it is commercial. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578-79 (1994).  Both inquiries disfavor ReDigi's claim.  Plainly, the upload, sale, and download of digital music files on ReDigi's website does nothing to

"add[] something new, with a further purpose or different character" to the copyrighted works.  *Id.*; *see, e.g.*, *Napster*, 239 F.3d at 1015 (endorsing district court finding that "downloading MP3 files does not transform the copyrighted work").  ReDigi's use is also undoubtedly commercial.  ReDigi and the uploading user directly profit from the sale of a digital music file, and the downloading user saves significantly on the price of the song in the primary market.  *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) ("The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.").  ReDigi asserts that downloads for personal, and not public or commercial, use "must be characterized as . . . noncommercial, nonprofit activity."  (ReDigi Mem. 16 (quoting *Sony*, 464 U.S. at 449).)  However, ReDigi twists the law to fit its facts.  When a user downloads purchased files from the Cloud Locker, the resultant reproduction is an essential component of ReDigi's commercial enterprise.  Thus, ReDigi's argument is unavailing.

The second factor – the nature of the copyrighted work – also weighs against application of the fair use defense, as creative works like sound recordings are "close to the core of the intended copyright protection" and "far removed from the . . . factual or descriptive work more amenable to fair use."  *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (alteration and internal quotation marks omitted) (citing *Campbell*, 510 U.S. at 586).  The third factor – the portion of the work copied – suggests a similar outcome because ReDigi transmits the works in their entirety, "negating any claim of fair use."  *Id.* at 352.  Finally,

---

[7]  ReDigi's argument is, perhaps, a relic of the argument it previously levied that "copying" to the Cloud Locker is protected as "space shifting" under the fair use doctrine.  (*See* ReDigi Opp'n to PI at 10.)

# SPA-11

ReDigi's sales are likely to undercut the "market for or value of the copyrighted work" and, accordingly, the fourth factor cuts against a finding of fair use. *Cf. Arista Records, LLC v. Doe 3*, 604 F.3d at 124 (rejecting application of fair use to P2P file sharing, in part, because "the likely detrimental effect of file-sharing on the value of copyrighted compositions is well documented." (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005)). The product sold in ReDigi's secondary market is indistinguishable from that sold in the legitimate primary market save for its lower price. The clear inference is that ReDigi will divert buyers away from that primary market. ReDigi incredibly argues that Capitol is preempted from making a market-based argument because Capitol itself condones downloading of its works on iTunes. (ReDigi Mem. 18.) Of course, Capitol, as copyright owner, does not forfeit its right to claim copyright infringement merely because it permits certain uses of its works. This argument, too, is therefore unavailing.

In sum, ReDigi facilitates and profits from the sale of copyrighted commercial recordings, transferred in their entirety, with a likely detrimental impact on the primary market for these goods. Accordingly, the Court concludes that the fair use defense does not permit ReDigi's users to upload and download files to and from the Cloud Locker incident to sale.

### 2. First Sale

The first sale defense, a common law principle recognized in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350 (1908) and now codified at Section 109(a) of the Copyright Act, provides that:

Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. § 109. Under the first sale defense, "once the copyright owner places a copyrighted item [here, a phonorecord] in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998); *see Kirtsaeng v. John Wiley & Sons, Inc.*, No. 11-697, 2013 WL 1104736, at *4 (U.S. Mar. 19, 2013).

ReDigi asserts that its service, which involves the resale of digital music files lawfully purchased on iTunes, is protected by the first sale defense. (ReDigi Mem. 19.) The Court disagrees.

As an initial matter, it should be noted that the fair use defense is, by its own terms, limited to assertions of the *distribution right*. 17 U.S.C. § 109 (referencing Section 106(3)); *see* Nimmer on Copyright § 8.12. Because the Court has concluded that ReDigi's service violates Capitol's reproduction right, the first sale defense does not apply to ReDigi's infringement of those rights. *See Design Options v. BellePointe, Inc.*, 940 F. Supp. 86, 91 (S.D.N.Y. 1996).

In addition, the first sale doctrine does not protect ReDigi's distribution of Capitol's copyrighted works. This is because, as an unlawful reproduction, a digital music file sold on ReDigi is not "lawfully made under this title." 17 U.S.C. § 109(a). Moreover, the statute protects

only distribution by "the owner of a *particular* copy or phonorecord . . . of *that* copy or phonorecord." *Id.* Here, a ReDigi user owns the phonorecord that was created when she purchased and downloaded a song from iTunes to her hard disk. But to sell that song on ReDigi, she must produce a new phonorecord on the ReDigi server. Because it is therefore impossible for the user to sell her "particular" phonorecord on ReDigi, the first sale statute cannot provide a defense. Put another way, the first sale defense is limited to material items, like records, that the copyright owner put into the stream of commerce. Here, ReDigi is not distributing such material items; rather, it is distributing *reproductions* of the copyrighted code embedded in new material objects, namely, the ReDigi server in Arizona and its users' hard drives. The first sale defense does not cover this any more than it covered the sale of cassette recordings of vinyl records in a bygone era.

Rejecting such a conclusion, ReDigi argues that, because "'technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of [its] basic purpose,'" namely, to incentivize creative work for the "ultimate[] . . . cause of promoting broad public availability of literature, music, and the other arts." *Sony*, 464 U.S. at 432 (quoting *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156 (1975)). Thus, ReDigi asserts that refusal to apply the first sale doctrine to its service would grant Capitol "a Court sanctioned extension of rights under the [C]opyright [A]ct . . . which is against policy, and should not be endorsed by this Court." (ReDigi Mem. 24.)

The Court disagrees. ReDigi effectively requests that the Court amend the statute to achieve ReDigi's broader policy goals – goals that happen to advance ReDigi's economic interests. However, ReDigi's

argument fails for two reasons. First, while technological change may have rendered Section 109(a) unsatisfactory to many contemporary observers and consumers, it has not rendered it ambiguous. The statute plainly applies to the lawful owner's "particular" phonorecord, a phonorecord that by definition cannot be uploaded and sold on ReDigi's website. Second, amendment of the Copyright Act in line with ReDigi's proposal is a legislative prerogative that courts are unauthorized and ill suited to attempt.

Nor are the policy arguments as straightforward or uncontested as ReDigi suggests. Indeed, when confronting this precise subject in its report on the Digital Millenium Copyright Act, 17 U.S.C. § 512, the United States Copyright Office (the "USCO") rejected extension of the first sale doctrine to the distribution of digital works, noting that the justifications for the first sale doctrine in the physical world could not be imported into the digital domain. *See* USCO, Library of Cong., DMCA Section 104 Report (2001) ("DMCA Report"); *see also Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 129 (2d Cir. 2008) (finding that the DMCA report is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). For instance, the USCO stated that "the impact of the [first sale] doctrine on copyright owners [is] limited in the off-line world by a number of factors, including geography and the gradual degradation of books and analog works." DMCA Report at xi. Specifically,

[p]hysical copies of works degrade with time and use, making used copies less desirable than new ones. Digital information does not degrade, and can be reproduced perfectly on a recipient's computer. The "used" copy is just as desirable as (in fact, is indistinguishable from)

a new copy of the same work. Time, space, effort and cost no longer act as barriers to the movement of copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost. The need to transport physical copies of works, which acts as a natural brake on the effect of resales on the copyright owner's market, no longer exists in the realm of digital transmissions. The ability of such "used" copies to compete for market share with new copies is thus far greater in the digital world.

*Id.* at 82-83 (footnotes omitted). Thus, while ReDigi mounts attractive policy arguments, they are not as one-sided as it contends.

Finally, ReDigi feebly argues that the Court's reading of Section 109(a) would in effect exclude digital works from the meaning of the statute. (ReDigi Mem. 21.) That is not the case. Section 109(a) still protects a lawful owner's sale of her "particular" phonorecord, be it a computer hard disk, iPod, or other memory device onto which the file was originally downloaded. While this limitation clearly presents obstacles to resale that are different from, and perhaps even more onerous than, those involved in the resale of CDs and cassettes, the limitation is hardly absurd – the first sale doctrine was enacted in a world where the ease and speed of data transfer could not have been imagined. There are many reasons, some discussed herein, for why such physical limitations may be desirable. It is left to Congress, and not this Court, to deem them outmoded.

Accordingly, the Court concludes that the first sale defense does not permit sales of digital music files on ReDigi's website.

## C.  Liability

Having determined that sales on ReDigi's website infringe Capitol's copyrights, the Court turns to whether ReDigi is directly and/or secondarily liable for that infringement. Direct liability requires "volitional conduct" that "causes" the reproduction or distribution to be made. *See Cartoon Network*, 536 F.3d at 131. Secondary infringement occurs when a defendant contributed to or benefitted from a third party's infringement such that it is "just" to hold the defendant accountable for the infringing activity. *Sony*, 464 U.S. at 435. For the reasons stated below, the Court finds that ReDigi directly and secondarily infringed Capitol's copyrights.

### 1.  Direct Infringement

To be liable for direct infringement, a defendant must have "engaged in some volitional conduct sufficient to show that [it] actively" violated one of the plaintiff's exclusive rights. *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009). In other words, "'to establish direct liability under . . . the Act, something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner.'" *Cartoon Network*, 536 F.3d at 130 (quoting *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004)) (citing *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995)).

In *Cartoon Network*, the Second Circuit addressed whether the cable television provider Cablevision had directly infringed the plaintiff's copyrights by providing

13

digital video recording devices to its customers. 536 F.3d 121. The court determined that it had not. Though Cablevision had "design[ed], hous[ed], and maintain[ed]" the recording devices, it was Cablevision's customers who "made" the copies and therefore directly infringed the plaintiff's reproduction rights. *Id.* at 131-32. The court reasoned that, "[i]n determining who actually 'makes' a copy, a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct." *Id.* at 131. However, the court allowed that a case may exist where "one's contribution to the creation of an infringing copy [is] so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy." *Cartoon Network*, 536 F.3d at 133.

On the record before it, the Court concludes that, if such a case could ever occur, it has occurred with ReDigi. ReDigi's founders built a service where *only* copyrighted work could be sold. Unlike Cablevision's programming, which offered a mix of protected and public television, ReDigi's Media Manager scans a user's computer to build a list of eligible files that consists *solely* of protected music purchased on iTunes. While that process is itself automated, absolving ReDigi of direct liability on that ground alone would be a distinction without a difference. The fact that ReDigi's founders programmed their software to choose copyrighted content satisfies the volitional conduct requirement and renders ReDigi's case indistinguishable from those where human review of content gave rise to direct liability. *See Usenet.com*, 633 F. Supp. 2d at 148; *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp.

503, 512-13 (N.D. Ohio 1997). Moreover, unlike Cablevision, ReDigi infringed both Capitol's reproduction and distribution rights. ReDigi provided the infrastructure for its users' infringing sales and affirmatively brokered sales by connecting users who are seeking unavailable songs with potential sellers. Given this fundamental and deliberate role, the Court concludes that ReDigi's conduct "transform[ed] [it] from [a] passive provider[] of a space in which infringing activities happened to occur to [an] active participant[] in the process of copyright infringement." *Usenet.com*, 633 F. Supp. 2d at 148. Accordingly, the Court grants Capitol's motion for summary judgment on its claims for ReDigi's direct infringement of its distribution and reproduction rights.[8]

### 2. Secondary Infringement

"The Copyright Act does not expressly render anyone liable for infringement committed by another." *Sony*, 464 U.S. at 434. However, common law doctrines permit a court to impose secondary liability where "just" and appropriate. *Id.* at 435. Capitol asserts that ReDigi is secondarily liable for its users' direct infringement under three such doctrines: contributory

---

[8] Capitol also asserts a claim for common law copyright infringement arising from sales of its pre-1972 recordings on ReDigi's website. (Compl. ¶¶ 82-88.) Capitol correctly argues in its memorandum that the elements for a direct infringement claim under federal law mirror those for infringement of common law copyright under state law. *See Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 563 (2005); (Cap. Mem. 4.) Accordingly, the Court also Court grants Capitol's motion for summary judgment with respect to ReDigi's direct infringement of Capitol's distribution and reproduction rights in its pre-1972 recordings. However, because neither Capitol nor ReDigi addressed the question of secondary infringement of common law copyrights, the Court does not reach that claim.

14

infringement, inducement of infringement, and vicarious infringement. (Cap. Mem. 13-16.)    The Court agrees with respect to contributory and vicarious infringement, and therefore does not reach the inducement claim.

### a. Contributory Infringement

Contributory infringement occurs where "one . . . with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Arista Records, LLC v. Doe 3*, 604 F.3d at 118 (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)); *see, e.g.*, *Grokster*, 545 U.S. at 930. The knowledge requirement is "objective" and satisfied where the defendant knew or had reason to know of the infringing activity. *See Arista Records, LLC v. Doe 3*, 604 F.3d at 118. Further, the support must be "more than a mere quantitative contribution to the primary infringement . . . [, it] must be substantial." *Usenet.com*, 633 F. Supp. 2d 124, 155 (S.D.N.Y. 2009). However, even where a defendant's contribution is material, it may evade liability if its product is "capable of substantial noninfringing uses." *Sony*, 464 U.S. at 442 (the "*Sony-Betamax* rule").

In weighing the knowledge requirement, courts consider evidence of actual and constructive knowledge, including cease-and-desist letters, officer and employee statements, promotional materials, and industry experience. *See, e.g.*, *Napster*, 239 F.3d at 1020-21, 1027; *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d at 432; *Usenet.com* 633 F. Supp. 2d at 155. In addition, courts have consistently found that material support existed where file-sharing systems provided "the site and facilities" for their users' infringement. *Napster*, 239 F.3d

at 1022; *see, e.g.*, *Usenet.com*, 633 F. Supp. 2d at 155.

The Court has little difficulty concluding that ReDigi knew or should have known that its service would encourage infringement. Despite the fact that ReDigi boasted on its website that it was "The Legal Alternative" and insisted "YES, ReDigi is LEGAL," ReDigi warned investors in its subscription agreements that "the law cannot be said to be well-settled" in this area and that it could not guarantee ReDigi would prevail on its copyright defenses. (Cap. 56.1 ¶¶ 65-66.) The Recording Industry Association of America ("RIAA") sent ReDigi a cease-and-desist letter in November 2011, advising ReDigi that its website violated Capitol's and other RIAA members' copyrights. (Compl. ¶ 41.)    Further, ReDigi was ensnared in a licensing dispute over song clips and cover art shortly after its launch, plainly indicating that infringement could be afoot. (RD 56.1 ¶¶ 74-75, 77.) ReDigi was also, of course, aware that copyright protected content was being sold on its website – a fact central to its business model and promotional campaigns. (Cap. 56.1 ¶¶ 70-73). Finally, ReDigi's officers claim to have "researched copyright law [and] consulted with attorneys" concerning their service, and also to have met with record companies "to get input, get marketing support[,] and enter into deals with the labels." (RD Rep. 56.1 2 ¶ 5, 5 ¶ 20.) By educating themselves, the officers presumably understood the likelihood that use of ReDigi's service would result in infringement.    Indeed, though ReDigi attempts to use its consultations with counsel as a shield, it is telling that ReDigi declined to reveal any of the advice it received on the subject. (*See* Cap. Reply 9). ReDigi's lone rebuttal to this surfeit of evidence could only be that it "sincerely" believed in the legality of its service.

**SPA-16**

However, the Court has not found and will not create a subjective, good faith defense to contributory liability's objective knowledge requirement, and therefore concludes that, based on the objective facts, ReDigi was aware of its users' infringement.

The Court also finds that ReDigi materially contributed to its users' infringement. As ReDigi has admitted, "more than any other website that permits the sale of music, ReDigi is intimately involved in examining the content that will be sold and supervising the steps involved in making the music available for sale and selling it." (Cap. 56.1 ¶ 35; RD Rep. 56.1 15 ¶ 35.) ReDigi thus provided the "site and facilities" for the direct infringement. *See, e.g.*, *Napster*, 239 F.3d at 1022; *Usenet.com*, 633 F. Supp. 2d at 155; *Lime Grp.*, 784 F. Supp. 2d at 434. Without ReDigi's Cloud Locker, no infringement could have occurred. Indeed, Media Manager ensured that *only* infringement occurred by limiting eligible files to iTunes tracks. Contrary to any conception of remote conduct, ReDigi's service was the hub and heart of its users' infringing activity.

The Court finally concludes that ReDigi's service is not capable of substantial noninfringing uses. The *Sony-Betamax* rule requires a court to determine whether a product or service is *capable* of substantial noninfringing uses, not whether it is currently used in a non-infringing manner. *Napster*, 239 F.3d at 1021 (discussing *Sony*, 464 U.S. at 442-43). But, put simply, ReDigi, by virtue of its design, is incapable of compliance with the law. ReDigi's business is built on the erroneous notion that the first sale defense permits the electronic resale of digital music. As such, ReDigi is built to trade only in copyright protected iTunes files. However, as determined above, ReDigi's legal argument

– and therefore business model – is fundamentally flawed. Accordingly, to comply with the law, either the law or ReDigi must change. While ReDigi 2.0, 3.0, or 4.0 may ultimately be deemed to comply with copyright law – a finding the Court need not and does not now make – it is clear that ReDigi 1.0 does not. Given the fundamental disconnect between ReDigi and the Copyright Act, and ReDigi's failure to provide any evidence of present or potential noninfringing uses, the Court concludes that the *Sony-Betamax* rule cannot save ReDigi from contributory liability.

Accordingly, the Court grants Capitol's motion for summary judgment on its claim for ReDigi's contributory infringement of its distribution and reproduction rights.[9]

b. Vicarious Infringement

Vicarious liability for copyright infringement exists where the defendant "'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'" *Napster*, 239 F.3d at 1022 (quoting *Gershwin Pub. Corp.*, 443 F.2d at 1162); *see Grokster*, 545 U.S. at 930. Unlike contributory infringement, knowledge is not an element of vicarious liability. *Gershwin*,

---

[9] As noted above, Capitol has alleged a separate cause of action for inducement of infringement. (Compl. ¶¶ 51-60.) Disagreement exists over whether "inducement of infringement" is a separate theory of liability for copyright infringement or merely a subset of contributory liability. *Compare Flava Works, Inc. v. Gunter*, 689 F.3d 754, 758 (7th Cir. 2012) (describing inducement as "a form of contributory infringement"), *with Lime Grp.*, 784 F. Supp. 2d at 424 ("In *Grokster*, the Supreme Court confirmed that inducement of copyright infringement constitutes a distinct cause of action."). Regardless, because the Court concludes that ReDigi is liable for contributing to its users' direct infringement of Capitol's copyrights, it does not reach Capitol's inducement claim.

16

443 F.2d at 1162; *see Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262-63 (9th Cir. 1996).

Clearly, ReDigi vicariously infringed Capitol's copyrights. As discussed, ReDigi exercised complete control over its website's content, user access, and sales. Indeed, ReDigi admits that it "is intimately involved in . . . supervising the steps involved in making the music available for sale and selling it" on the website. (Cap. 56.1 ¶ 35; RD Rep. 56.1 ¶35); *see, e.g., Lime Grp.*, 784 F. Supp. 2d at 435 (finding right to supervise where P2P file sharing system could filter content and regulate users). In addition, ReDigi financially benefitted from every infringing sale when it collected 60% of each transaction fee. *See, e.g., Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963) (finding a direct financial benefit where the defendant received a share of the gross receipts on every infringing sale). Notably, ReDigi failed to address any of these arguments in its opposition brief, instead insisting that it was not vicariously liable for infringement that occurred *outside* the ReDigi service, for instance, when a user impermissibly retained files on his computer. (*See* ReDigi Opp'n 22-23.) However, this argument is inapposite to the instant motions. Accordingly, the Court grants Capitol's motion for summary judgment on its claim for ReDigi's vicarious infringement of its distribution and reproduction rights.

### IV. CONCLUSION

At base, ReDigi seeks judicial amendment of the Copyright Act to reach its desired policy outcome. However, "[s]ound policy, as well as history, supports [the Court's] consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology." *Sony*, 464 U.S. at 431. Such deference often counsels for a limited interpretation of copyright protection. However, here, the Court cannot of its own accord condone the wholesale application of the first sale defense to the digital sphere, particularly when Congress itself has declined to take that step. Accordingly, and for the reasons stated above, the Court GRANTS Capitol's motion for summary judgment on its claims for ReDigi's direct, contributory, and vicarious infringement of its distribution and reproduction rights. The Court also DENIES ReDigi's motion in its entirety.

Because issues remain with respect to Capitol's performance and display rights, and ReDigi's secondary infringement of Capitol's common law copyrights, as well as damages, injunctive relief, and attorney's fees, IT IS HEREBY ORDERED THAT the parties shall submit a joint letter to the Court no later than April 12, 2013 concerning the next contemplated steps in this case.

The Clerk of Court is respectfully directed to terminate the motions pending at Doc. Nos. 48 and 54.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 30, 2013
New York, New York

*        *        *

17

Plaintiff is represented by Richard Stephen Mandel, Jonathan Zachary King, and Robert William Clarida of Cowan, Liebowitz & Latman, P.C., 1133 Avenue of the Americas, New York, New York 10036.

Defendant is represented by Gary Philip Adelman of Davis Shapiro Lewit & Hayes LLP, 689 Fifth Avenue, Fifth Floor, New York, New York 10022.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3·30·13

SPA-19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X

CAPITOL RECORDS, LLC, CAPITOL : 12 Civ. 0095 (RJS)
CHRISTIAN MUSIC GROUP, INC. and
VIRGIN RECORDS IR HOLDINGS, INC., :

　　　　　　　　　Plaintiffs, :

　-against- :

REDIGI INC., JOHN OSSENMACHER and :
LARRY RUDOLPH a/k/a LAWRENCE S.
ROGEL, :

　　　　　　　　　　:

　　　　　　　　　Defendants.
--------------------------------------------------------------- X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6·3·16

**STIPULATED FINAL JUDGMENT**
**SUBJECT TO RESERVATION OF RIGHT OF APPEAL**

WHEREAS, on January 6, 2012, Capitol Records, LLC ("Capitol") commenced this

action (the "Action") against ReDigi Inc. ("ReDigi"), alleging that aspects of the ReDigi music

service, which asserted that it provided an online marketplace for among other things the alleged

"re-sale" of digital music files, constituted copyright infringement of Capitol's sound recordings

under the United States Copyright Act and the common law of the State of New York; and

WHEREAS, on March 30, 2013, the Court issued a Memorandum and Order in the

Action (ECF No. 109) granting Capitol's motion for summary judgment finding ReDigi directly

and secondarily liable for copyright infringement based on the unauthorized reproduction and

distribution of Capitol's sound recordings (the "Summary Judgment Order"); and

WHEREAS, on August 30, 2013, Capitol filed a First Amended Complaint in the Action

adding ReDigi's founders, John Ossenmacher ("Ossenmacher") and Larry Rudolph a/k/a

Lawrence S. Rogel ("Rudolph"), as additional defendants; and

WHEREAS, on October 30, 2014, Capitol, Capitol Christian Music Group, Inc. ("CCMG") and Virgin Records IR Holdings, Inc. ("Virgin") filed a Second Amended Complaint in the Action adding CCMG and Virgin as additional plaintiffs; and

WHEREAS, on November 2, 2015, the Court entered an order approving a joint conditional stipulation as to the individual liability of Ossenmacher and Rudolph for copyright infringement; and

WHEREAS, the Court has scheduled a trial for April 11, 2016 in order to determine the amount of damages to which Capitol, CCMG and Virgin (collectively, "Plaintiffs") are entitled against ReDigi, Ossenmacher and Rudolph (the "ReDigi Parties") for the copyright infringement claims previously adjudicated in the Summary Judgment Order; and

WHEREAS, in order to avoid the expense and burden of a damages trial, while reserving Defendants' right to appeal the Summary Judgment Order, the parties have agreed to enter into this Stipulated Conditional Final Judgment to fix the amount of damages and the form of an injunction and permit the parties to proceed to an appeal of the Summary Judgment Order.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.      This Court has jurisdiction over the parties hereto and over the subject matter in issue, and venue is proper in this District.

2.      In the interest of efficiency and judicial economy, Plaintiffs and the ReDigi Parties agree to stipulate to the amount of damages set forth in paragraph 4 below and the form of a final injunction set forth in paragraph 5 below in order to permit this case to proceed to an appeal of the Summary Judgment Order.  The relief awarded in paragraphs 4 and 5 below is expressly conditioned on the ReDigi Parties' reservation of their right of appeal as set forth in

-2-

**SPA-21**

paragraph 3 below.

3.      The parties stipulate that the the ReDigi Parties have expressly reserved their right on appeal to challenge solely the judgment of liability for copyright infringement as addressed in the Summary Judgment Order and no other rulings or orders in this case.  If the judgment of liability for copyright infringement is reversed or vacated on appeal, wholly or partially, this Stipulated Final Judgment shall be set aside to the extent inconsistent with  any such decision on appeal or ruling of this Court on remand.  For the purpose of clarity, to the extent the question of the ReDigi Parties' liability for copyright infringement is reversed, reversed in part, or vacated and remanded, in whole or in part, both the damages award and the injunction will be set aside to the extent inconsistent with such a ruling. Otherwise, the parties agree that the provisions of this Stipulated Final Judgment, including the award of damages and injunction set forth in paragraphs 4 and 5, shall be fully binding on all parties.  Enforcement of this Stipulated Conditional Final Judgment shall not be stayed pending appeal.

4.      Subject to paragraphs 2-3 above, the parties stipulate that the amount of damages awarded to Plaintiffs against the ReDigi Parties jointly and severally shall be three million five hundred thousand dollars ($3,500,000).  For purpose of this judgment, the amount of damages is stipulated to be an equal amount for each recording Plaintiffs have accused Defendants of infringing.

5.      Subject to paragraphs 2-3 above, the ReDigi Parties and any of their respective officers, agents, servants, representatives, directors, affiliates, employees, successors, assigns and licensees and any other entities which the ReDigi Parties control, to the extent such persons or entities are working under the ReDigi Parties' control, and all persons or companies in active concert or participation with any of them or acting on their behalf, are permanently enjoined and

-3-

**SPA-22**

restrained from directly engaging in the United States or assisting others in engaging in the United States in the unauthorized sale, offering for sale, or distribution, or reproduction facilitating such sale, offer for sale or distribution, of any copyrighted sound recordings or musical compositions owned by Plaintiffs, UMG Recordings, Inc. or any of their parents, subsidiaries, affiliated or related companies, divisions or record labels (collectively, "UMG Content"), or any other direct or secondary infringement of the copyrights in UMG Content in the United States, including, without limitation, by operating, offering, using or otherwise exploiting the services known as ReDigi 1.0 and ReDigi 2.0..

6.    The parties agree that costs (other than attorneys' fees) shall not be awarded. However, Plaintiffs shall have the right under this Judgment to move for an award of attorneys' fees, provided that the amount of such fees to be sought by Plaintiffs shall be capped at not more than five hundred thousand dollars ($500,000) and the ReDigi Parties shall retain the right to oppose any such motion for an award of attorneys' fees. Nothing contained herein shall have any effect on the right of Plaintiffs or the ReDigi Parties to seek an award of attorneys' fees in connection with the appeal of this Stipulated Conditional Final Judgment or any future proceedings in the District Court that may occur following the entry of this Stipulated Conditional Final Judgment.

7.    This Court shall retain continuing jurisdiction over the parties to this Stipulated Conditional Final Judgment and over the subject matter of the Action for the purposes of interpreting and enforcing the terms of this Stipulated Final Judgment, subject to the ReDigi Parties' right of appeal set forth above

-4-

**SPA-23**

AGREED AS TO FORM AND SUBSTANCE:

COWAN, LIEBOWITZ & LATMAN, P.C.

By:

Richard S. Mandel
114 West 47th Street
New York, New York 10036
(212) 790-9200

Attorneys for Plaintiffs

CAPITOL RECORDS, LLC

By:

Name: Alasdair J. McMullan
Title: Head of Litigation


CAPITOL CHRISTIAN MUSIC GROUP, INC.

By:

Name: Alasdair J. McMullan
Title: Head of Litigation


VIRGIN RECORDS IR HOLDINGS, INC.

By:

Name: Alasdair J. Mc Mullan
Title: Head of Litigation


MISHCON DE REYA NEW YORK LLP

By:

Mark S. Raskin
Two Park Avenue, 20th Floor
New York, New York 10016
(212) 612-3270


ADELMAN MATZ, P.C.

By:

Gary P. Adelman
1173A Second Ave., Suite 153
New York, New York, 10065
(646) 650-2207

Attorneys for Defendants

REDIGI INC.

By: John Ossenmacher
          Name:
          Title:   President

JOHN OSSENMACHER


LARRY RUDOLPH a/k/a
LAWRENCE S. ROGEL


APPROVED AND ORDERED this 3rd day of June, 2016


RICHARD J. SULLIVAN, U.S.D.J.

-5-

**SPA-24**

**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted*. If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/**.

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

**SPA-25**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the    ☐ judgment    ☐ order    entered on: _____

(date that judgment or order was entered on docket)

that: _____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____        _____
Dated                            Signature*

_____
Name (Last, First, MI)

_____
Address                City            State            Zip Code

_____        _____
Telephone Number                 E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

**SPA-26**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

_____CV_____ (       )(       )

-against-

**MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL**

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appearance within the required

      date

time period because:

_____

_____

_____

(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)

_____          _____

Dated:          Signature

_____

Name (Last, First, MI)

_____

Address          City          State          Zip Code

_____          _____

Telephone Number          E-mail Address (if available)

Rev. 12/23/13

**SPA-27**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____        _____CV_____ (        )(        )

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                                    **MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

_____

(List the full name(s) of the defendant(s)/respondent(s).)

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed _in forma pauperis_ on appeal. This motion is supported by the attached affidavit.

_____          _____
Dated                            Signature

_____
Name (Last, First, MI)

_____
Address              City          State             Zip Code

_____          _____
Telephone Number                 E-mail Address (if available)

Rev. 12/23/13

**SPA-28**

## Application to Appeal In Forma Pauperis

_____**v.** _____     Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.) | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number. |
| Signed: _____ | Date: _____ |

My issues on appeal are: (<u>required</u>):

1.      *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

12/01/2013 SCC

**SPA-29**

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2.   *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.   *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

**SPA-30**

4.      *How much cash do you and your spouse have? $_____*

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts.  If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.      *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

- 3 -

**SPA-31**

6.  *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |

7.  *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

8.  *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

|  | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>    Are real estate taxes included?        [  ] Yes [  ] No<br>    Is property insurance included?        [  ] Yes [  ] No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

**SPA-32**

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
| Homeowner's or renter's: | $ | $ |
| Life: | $ | $ |
| Health: | $ | $ |
| Motor vehicle: | $ | $ |
| Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
| Motor Vehicle: | $ | $ |
| Credit card (name): | $ | $ |
| Department store (name): | $ | $ |
| Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | **$ 0** | **$ 0** |

9.    *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

[   ] Yes        [   ] No        If yes, describe on an attached sheet.

10.    *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* [   ] Yes [   ] No

*If yes, how much?* $ _____

- 5 -

**SPA-33**

11.     *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.     *Identify the city and state of your legal residence.*

City _____     State _____

Your daytime phone number: _____

Your age: _____     Your years of schooling: _____

Last four digits of your social-security number: _____

**SPA-34**

**United States District Court**
**Southern District of New York**

# HOW TO APPEAL YOUR CASE TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted*. If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/**.

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14